2011 Ark. 19

**ALLSTATE INSURANCE COMPANY, Appellant**

v.

**Jon H. DODSON, M.D., Appellee.**

No. 10–257.

Supreme Court of Arkansas.

Jan. 27, 2011.

Luce, Forward, Hamilton & Scripps, LLP, by: Ronald D. Getchey, and Williams & Anderson PLC, Little Rock,

by: Philip E. Kaplan, JoAnn C. Maxey, and Jamie K. Fugitt, for appellant.

David M. Hargis, Little Rock, for appellees.

ROBERT L. BROWN, Justice.

[1]Appellee and cross-appellant, Dr. Jon H. Dodson (Dodson), is a radiologist who built his medical practice in Little Rock and in Pine Bluff in the early 1980s. Dodson's clinics provided, among other services, physical therapy. Around 1993, Dodson began receiving complaints from Allstate Insurance Company (Allstate) that he did not employ licensed physical therapists in his physical-therapy department. Allstate began refusing to pay for claims based on physical therapy performed at Dodson's clinics by unlicensed personnel and, allegedly, made statements about Dodson's "illegal" use of these physical therapists. These statements, as well as others, became the basis for the ultimate litigation filed by Dodson against Allstate.

On September 3, 1997, Dodson filed a complaint against Allstate and two of its agents in Arkansas, Bobbie Waddell and John Runkle, alleging that these employees, at Allstate's behest, defamed Dodson by representing to insureds and claimants that Dodson provided [2]unqualified physical-therapy treatment at his office and that this amounted to fraud. Dodson also complained that Allstate represented that he overcharged for this therapy treatment, and that his medical practice was illegal. Dodson further alleged that these defamatory statements were made with an intent to damage his professional reputation. Dodson also included a cause of action for tortious interference with a business expectancy.

Allstate, Waddell, and Runkle answered and denied Dodson's allegations. They also filed a counterclaim in which they alleged that Dodson had engaged in nu-

merous deceitful, fraudulent, and illegal acts, which included Dodson's failure to employ state-licensed physical therapy assistants and misrepresentations to Allstate regarding the treatment he provided to patients. Before this case first went to trial in September 1999, Allstate dismissed its counterclaim. At the close of the first trial, prior to instructing the jury, Dodson dismissed his claims against Runkle and Waddell and proceeded only against Allstate. A Pulaski County jury found in favor of Allstate on Dodson's claims of defamation and tortious interference with a business expectancy. Dodson filed his first appeal, raising seven points for reversal.[1]

In that first appeal, this court rejected most of Dodson's arguments but reversed and remanded on Dodson's argument that the trial court had erred in ruling that Allstate's withdrawn counterclaim could not be used at trial as evidence that Allstate defamed or interfered with Dodson's contractual relationships with his patients. See Dodson v. Allstate Ins. Co., 345 Ark. 430, 47 S.W.3d 866 (2001) (Dodson I ). This court held that the withdrawn counterclaim constituted proper impeachment evidence because Dodson was attempting to rebut Allstate's claims that it had never defamed Dodson. This court concluded that the trial court "abused its discretion and committed error in not allowing the defendants' withdrawn counterclaim to be used as impeachment evidence." Id. at 451, 47 S.W.3d at 880.

After remand, the case was scheduled for trial on January 12, 2004. The retrial began, but after two days of trial, the trial court granted a mistrial for the reason that, during the course of the trial, one of the jurors communicated her opinion of the case to other jurors. About seven months later, Allstate moved for summary judgment on the basis that a jury could not reasonably find that Dodson's alleged damages were caused by Allstate. The trial court initially denied Allstate's motion, but on March 16, 2005, the court vacated its earlier order and entered its order granting Allstate's motion. Dodson filed his second timely notice of appeal and raised four points for reversal.

In the second appeal, Dodson v. Allstate Ins. Co., 365 Ark. 458, 231 S.W.3d 711 (2006) (Dodson II ), this court concluded that genuine issues of material fact remained regarding Allstate's intent with respect to its allegedly defamatory statements about how Dodson ran his medical practice. Accordingly, we held that summary judgment was not appropriate, and we reversed and remanded for further proceedings.

The trial that is the subject of this third appeal commenced on May 26, 2009, in Pulaski County Circuit Court. The trial continued for six days, and the jury returned a verdict in favor of Dodson in the amount of $6 million in compensatory damages and $15 million in punitive damages. Allstate moved for a judgment notwithstanding the verdict, a new trial, and requested a remittitur. The trial court remitted punitive damages to the sum of $6 million, to match those awarded as compensatory damages. Allstate filed a notice of appeal, and Dodson filed a notice of cross-appeal on the remittitur issue.

## I. Binding Instructions

For its first point on appeal, Allstate claims that the trial court gave two binding instructions to the jury that in effect di-

---

1. This case is before this court for the third time. See Dodson v. Allstate Ins. Co., 345 Ark. 430, 47 S.W.3d 866 (2001) (Dodson I ); Dodson v. Allstate Ins. Co., 365 Ark. 458, 231 S.W.3d 711 (2006) (Dodson II ).

rected the jury to rule in Dodson's favor. The two instructions at issue were not Arkansas Model Instructions but were proffered by Dodson. The first special instruction [2] given by the court read:

> You are instructed and under the law of the state of Arkansas, and throughout the entire time period involved in this case, plaintiff Jon H. Dodson, MD, and his medical practice have been subject to the provision requirements of the Arkansas Medical Practices Act, and not the Arkansas Physical Therapy Act. In other words, the Arkansas Medical Board and not the Arkansas Physical Therapy Board, had regulatory authority over Jon H. Dodson, MD, and his medical practice, throughout the entire time period involved in this case.

The trial court next instructed the jury:

> You are also instructed that there is a physical therapy act which exists in the state which provides in relevant part, nothing in this chapter shall be deemed to prohibit any person licensed under any other act in this state from engaging in the practice for which he is licensed. Therefore, you are instructed as a matter of law, that Jon H. Dodson, MD, and all other physicians are specifically excepted from the Arkansas Physical Therapy Act to the extent stated.

Specifically, Allstate claims that these instructions, which it identifies as Special Instruction No. 1 and Special Instruction No. 2, respectively, were given in error because in giving these instructions, the trial court commented on the evidence and impermissibly adopted Dodson's theory of the case. Furthermore, Allstate asserts that the given instructions were incorrect statements of the law. Dodson counters that Allstate failed to object specifically to these instructions and therefore waived the right to mount its objections to these instructions on appeal.

A party is entitled to a jury instruction when it is a correct statement of the law and there is some basis in the evidence to support giving the instruction. *See Dodson I,* 345 Ark. at 459, 47 S.W.3d at 885; *see also Coca–Cola Bottling Co. v. Priddy,* 328 Ark. 666, 945 S.W.2d 355 (1997). This court will not reverse a trial court's refusal to give a proffered instruction unless there was an abuse of discretion. *Barnes v. Everett,* 351 Ark. 479, 492, 95 S.W.3d 740, 748 (2003). When instructions are requested that do not conform to AMI instructions, they should be given only when the trial judge finds that the AMI instructions do not contain an essential instruction or do not accurately state the law applicable to the case. *Id.* (citing *Tyson Foods, Inc. v. Davis,* 347 Ark. 566, 66 S.W.3d 568 (2002)).

We have said that AMI instructions are to be used as a rule, and non-AMI instructions should only be used when an AMI instruction does not exist or cannot be modified. *Id.* It is error for the trial court to fail to instruct the jury on a statute applicable to the case; however, it is also error for the trial court to instruct the jury on an inapplicable statute. *Hunt-*

---

**2.** The court permitted the first special instruction to be read to the jury apparently based on her interpretation of the Arkansas Medical Practices Act. The judge made the following statement in reference to these special instructions: "I don't think there's any doubt that he is a doctor and not a physical therapist. And, therefore, that he may perform physical therapy, and that people in his office may perform physical therapy operations under his supervision who are not licensed." She also stated that she was going to instruct the jury on the law of Arkansas as set out in the statutes but was not going to give instructions on anything that came up in the opinion letter written by the counsel for Arkansas Medical Board.

*er v. McDaniel Constr. Co., Inc.,* 274 Ark. 178, 181, 623 S.W.2d 196, 200 (1981). Portions of a statute not applicable to the facts of the case must be deleted. *Id.*

■ Specific objections to instructions are necessary to preserve the issue for appeal. Ark. R. Civ. P. 51. Arkansas Rule of Civil Procedure Rule 51 states in part:

No party may assign as error the giving or the failure to give an instruction unless he objects thereto before or at the time the instruction is given, stating distinctly the matter to which he objects and the grounds of his objection, and no party may assign as error the failure to instruct on any issue unless a party has submitted a proposed instruction on that issue.

Rule 51 further reads that a "general objection shall not be sufficient to obtain appellate review of the court's action relating to instructions to the jury except as to an instruction directing a verdict or the court's action in declining to do so." Ark. R. Civ. P. 51. This court has interpreted this rule to require specific objections in order to alert the trial court as to why the instruction is wrong. *See Precision Steel Warehouse, Inc. v. Anderson–Martin Mach. Co.,* 313 Ark. 258, 270, 854 S.W.2d 321, 327 (1993) (citing *Chandler & Ramsey v. Kirkpatrick,* 270 Ark. 74, 603 S.W.2d 406 (1980)).

■ A general objection to a jury instruction is permissible only if the instruction is inherently erroneous, meaning the instruction could not be correct under any circumstance, and is binding in nature. *See Koch v. Missouri Pac. R.R. Co.,* 248 Ark. 1251, 1252, 455 S.W.2d 858, 859 (1970); *see also Advocat, Inc. v. Sauer,* 353 Ark. 29, 65, 111 S.W.3d 346, 367 (2003). This court has held that an erroneous instruction, which is likely to mislead the jury, is prejudicial. *Advocat, Inc.,* 353 Ark. at 65, 111 S.W.3d at 367.

At trial, the court read Special Instruction No. 1 as quoted above, and then asked the parties if there were any objections to this instruction. The following colloquy occurred between the court and Allstate's counsel:

THE COURT: Any objection to that?

DEFENSE COUNSEL: Yes.

THE COURT: Okay. Go ahead.

DEFENSE COUNSEL: Well, Your Honor, number one, I know it's their theory of the case, but also is that while Dr. Dodson, his staff in there, people that I've talked to in his office when he's not there . . .

THE COURT: I think I'm going to give that instruction. I will consider it, but I think I will. I mean, I don't plan to give all the instructions he wants but I just think that's fair. Instruction regarding licensing and massage therapy . . .

■ It is clear that Allstate's counsel made an objection to Special Instruction No. 1 and began to explain the reasoning behind this objection. At that point, the court interrupted Allstate's counsel during her explanation, and counsel did not make her specific objection to this instruction part of the record. It is the duty of the appealing party to present a record from which this court can determine that an error occurred. *See Gilliam v. Thompson,* 313 Ark. 698, 701, 856 S.W.2d 877, 879 (1993). This was not done.

■ Allstate also maintains that it was not required to make a specific objection, and that a general objection was sufficient because Special Instruction No. 1 was inherently erroneous. An inherently erroneous instruction is one that could not be correct under any circumstance. *See Koch,* 248 Ark. at 1252, 455 S.W.2d at 859. Allstate argues that Special Instruction

No. 1 misstated the law and eliminated Allstate's defense—that Dodson's unlicensed employees were subject to the dictates of the Physical Therapy Act and were not merely part of Dodson's medical practice. And yet Special Instruction No. 1 appears to accurately reflect the law and present the issue that the jury had to decide; that is, were the unlicensed physical therapists involved part of Dodson's medical practice and thus regulated by the Arkansas Medical Board or were they regulated, as not part of Dodson's practice, under the Physical Therapy Act? We conclude that this instruction is not inherently erroneous and a general objection to it by counsel was not sufficient.

As to Special Instruction No. 2, which is quoted above, Allstate objected to this instruction on two separate occasions at trial. Allstate's counsel argued that instead of just instructing the jury as to subsection (c) of Arkansas Code Annotated § 17–93–301, which Special Instruction No. 2 does, the jury should be instructed on the entire statute.[3] Specifically, Allstate's counsel contended that the entire statute should be included in the instruction arguing that "[s]ubsection (o) [sic] says if you're going to be talking to another physical therapist and you're not a physical therapist then it's unlawful unless you have . . . ." At that point, the trial court interrupted Allstate's counsel and stated that she would look at a revision, but that the instruction would be given because it was a fair statement of the law. At the next discussion concerning jury instructions, Allstate's counsel again related that it would proffer the entire statute as opposed to just subsection (c). However, at no point did Allstate's counsel expand on her reasoning as to why the entire statute should have been given as opposed to just subsection (c).

When the point on appeal concerns the trial court's failure to give an instruction, the party appealing must submit a proposed instruction on the issue. *See Gilliam*, 313 Ark. at 701, 856 S.W.2d at 879. This was done by Allstate's counsel. In addition, the appealing party must present an argument to the trial court as to why the proffered instruction should be given. *Id.* In the instant case, Allstate objected to Special Instruction No. 2 by arguing that the entire section should be given to the jury and not just subsection (c) and proffered the entire statute. Yet, Allstate never presented arguments as to *why* Special Instruction No. 2 was a binding instruction and *why* the entire statute should have been given to the jury. Hence, there was no argument to the trial court that by failing to give the jury subsections (a) and (b) of section 17–93–301, the court eliminated Allstate's defense that

3. At the time of this lawsuit, Ark.Code Ann. § 17–93–301 read as follows:

(a) It shall be unlawful for any person to practice physical therapy or to profess to be a physical therapist, physiotherapist, physical therapy technician, or to use the initials "PT," "PHT," "RPT," or any other letters, words, abbreviations, or insignia indicating that he is a physical therapist or to practice or to assume the duties incident to physical therapy without first obtaining from the board a license authorizing the person to practice physical therapy in this state.

(b) It shall be unlawful for any person to practice as a physical therapist assistant without first obtaining from the board a license or temporary permit authorizing the person to practice as a physical therapist assistant in the state.

(c) Nothing in this chapter shall be deemed to limit the authority of or prohibit any person licensed under any other act in this state from engaging in the practice for which he or she is licensed nor prevent students who are enrolled in accredited physical therapy or physical therapist assistant education programs from performing acts of physical therapy incidental to their courses of study.

Dodson's use of unlicensed employees violated that statute. This court has frequently held that it will not consider arguments on appeal that were not presented before the trial court. *Gilliam*, 313 Ark. at 701, 856 S.W.2d at 879 (citing *Viking Ins. Co. v. Jester*, 310 Ark. 317, 836 S.W.2d 371 (1992)). Accordingly, we will not consider the arguments advanced by Allstate on this point. Furthermore, we do not consider Special Instruction No. 2 to be an inherently erroneous instruction due to "incompleteness" because instructions on subsections (a) and (b) were not given. The instruction accurately reflects section 17–93–301(c) and for that reason is not inherently erroneous.

## II. *Causation and Damages*

Allstate next claims that Dodson failed to meet his burden of proof on both the causation and damages elements of his defamation and tortious interference claims. Specifically, it contends that Dodson failed to provide any evidence that he lost existing or prospective patients as a result of Allstate's conduct. Allstate further argues that the only evidence Dodson offered as to damages was the decline in his practice and his annual income for many years after the slanderous statements were made. Allstate points out, in addition, that there were other potential causes for this decline and that Dodson had the burden of eliminating those other causes.[4] Allstate contends that because

Dodson failed to prove causation and damages, there was insufficient evidence to support the jury's compensatory-damages award, and that award should be vacated or reduced.

More precisely, Allstate maintains that Dodson did not put on proof of a specific existing patient who was lost, or identify a prospective patient that he lost, due to Allstate's conduct. Dodson counters that several patients did testify that Allstate's agents made statements to them concerning Dodson's illegal and fraudulent practice. Regina Coates, a former patient of Dodson, testified that while at a party, she engaged in a conversation with an Allstate adjuster who told her that Dodson's claims and practices were unfair, that his bills were inflated, and that he treated people who were not hurt. Paulette Bassett, a former patient of Dodson, testified that Bobbie Waddell, a former claims adjuster with Allstate, got involved on her claim and began to badger her by asking questions about Dodson's care and therapy. Bassett also testified that Waddell asked her about the nature of Dodson's practice and suggested that she see another doctor. Mikal Rasul, a former patient of Dodson, testified that he had a claim with Allstate and that John Runkle, a former claims adjuster with Allstate, contacted him about his claim. Rasul testified that Runkle asked him numerous questions about Dodson's business, about whether he could have chosen to see another doctor,

---

4. These seven other factors cited by Allstate are: (1) attorneys stopped taking soft tissue injury cases because they were losing these cases at trial; (2) personal injury attorneys were not referring clients to Dodson because they were receiving adverse jury verdicts in cases involving Dodson and his clinic; (3) patients were enrolling in HMOs during the 1990s and being directed to physical therapists within the HMO network; (4) Dodson's physical therapy clinic was losing money because he failed to account for, and collect, his accounts receivable during the relevant time period; (5) physicians in general experienced a five percent decrease in income from 1995–1999; (6) in some years Dodson's revenue actually increased, but that his expenses increased even more; and (7) the worker's compensation claimants, who constituted a significant percentage of Dodson's physical therapy patients, were having their claims impacted by the significant tightening of Arkansas's Workers' Compensation laws in 1993.

and informed Rasul that Dodson was running an illegal business. Rasul further testified that Runkle told him that Dodson was not using licensed physical therapists and that the people in his office could just be "off the street." He also testified that Runkle told him that Dodson usually prescribed medications in order to make the claims higher. Rasul added that Runkle told him that Allstate was going to do whatever they could "to shut his business down."

Dodson's patient, Harry Bassett, was an additional witness. He testified that adjuster Waddell handled his claim and she told him that Allstate was not going to pay Dodson because his people did not have licenses and because he was overcharging. Bassett testified that Waddell made it seem like Dodson was doing something fraudulent. The video deposition of Dodson's patient, Melvin Baines, was also introduced. Baines testified that he spoke with Waddell and Runkle about his claim. He testified that both told him that Dodson had illegal personnel that were not qualified to give therapy. He was told that Dodson was conducting an illegal operation and that they had him under investigation.

Dodson also introduced the testimony of several attorneys who testified about why they stopped referring their clients to Dodson for medical care and treatment. Peter Miller, a personal-injury attorney in Little Rock, testified that he stopped referring his clients to Dodson because he knew that if he referred his clients to Dodson, they would get less money in settlement from Allstate. He testified that his clients would end up owing Dodson because Allstate would refuse to pay the physical-therapy bills, and this was not the best outcome for his clients. He also testified that the origin of this problem began with Allstate's recalcitrance in refusing to pay for physical-therapy services performed by Dodson's employees.

Robert Cortinez, a general-practice attorney in Little Rock and Pine Bluff, testified that in 1992 or 1993, Dodson had a very busy medical practice. He testified that the last time he went to Dodson's office, about five years ago, there were significantly fewer patients at his office. He also testified that the comments being made by Allstate about Dodson's practice were prevalent throughout Jefferson County. He said that the word on the street was that Dodson was running an illegal practice, and that if he continued, he would not be in business much longer. He testified that part of the reason he does not refer clients to Dodson at this time is that many people now have their own health insurance and are required to see doctors and physical therapists within their network.

Dodson, in addition, introduced the testimony of several doctors who testified that Dodson's reputation and practice were damaged by Allstate's defamatory statements. For example, Dr. William Rutledge testified that Dodson used to have a thriving practice, especially in the late 1980s and early 1990s. He said, however, that this had changed over the years, and Dodson started to have less traffic from patients. He testified that in 2005, Dodson asked him to work with him, hoping that it would rebuild some of his credibility. Rutledge testified that Dodson's reputation had been harmed because of Allstate and that his practice declined dramatically. He further testified that his work with Dodson was not as successful as he hoped it would be because it was difficult to overcome the rumors and attacks that Allstate made against them.

Allstate counters this by arguing that there were seven other possible reasons for Dodson's decline in income that were

introduced at trial, as described above in footnote 4. It further contends that it has an obligation to investigate suspected illegal practices and the question of whether unlicensed physical therapists should be paid under these circumstances is an open question in Arkansas.

With respect to compensatory damages, the jury was instructed under Arkansas Model Instructions—Civil 2201 and 2206, as follows:

> If you decide for the plaintiff, Jon H. Dodson, MD, and/or Forest Park Medical Clinic, PA, on the question of liability against Allstate Insurance Company, you must then fix the amount of money which will reasonably and fairly compensate them or one of them for any of the following two elements of damage sustained which you find were proximately caused by the intentional wrongdoing of the defendant. First, the value of any profits lost and the present value of any profits reasonably certain to be lost in the future. Second, any mental anguish experienced in the past and reasonably certain to be experienced in the future.

■ Our standard of review for an award for compensatory damages on appeal is as follows:

> When an award of damages is alleged on appeal to be excessive, we review the proof and all reasonable inferences most favorable to the appellee and determine whether the verdict is so great as to shock our conscience or demonstrate passion or prejudice on the part of the jury.

*Bank of Eureka Springs v. Evans,* 353 Ark. 438, 455, 109 S.W.3d 672, 682 (2003) (citing *Ellis v. Price,* 337 Ark. 542, 551, 990 S.W.2d 543, 548 (1999) (internal citations omitted)). The burden to be met under this standard of review in such a case is whether there is substantial evidence to support the verdict. *Advocat, Inc. v.*

*Sauer,* 353 Ark. 29, 43, 111 S.W.3d 346, 352 (2003).

■ In a case for defamation, there must be evidence that establishes a causal connection between the defamatory statements and the injury suffered by the plaintiff. *See Wal–Mart Stores, Inc. v. Lee,* 348 Ark. 707, 738, 74 S.W.3d 634, 655 (2002). The issue of causation is a question of fact for the jury to decide. *Id.* at 738, 74 S.W.3d at 656. The evidence presented by Dodson included attorney Peter Miller's testimony; attorney Robert Cortinez's testimony; Dr. William Rutledge's testimony; and the testimony of numerous patients of Dodson. When viewed in a light most favorable to the appellee, we hold that this was substantial evidence to support a jury's finding that Allstate's statements caused Dodson's damages and injury and that those damages are measured in terms of lost profits.

Allstate claims, however, that Dodson was required to eliminate the other possible causes for the decline in his income espoused by Allstate and listed in footnote 4. Allstate bases this argument on this court's decision in *Wasp Oil, Inc. v. Arkansas Oil and Gas, Inc.,* 280 Ark. 420, 658 S.W.2d 397 (1983). In that case, this court held that the defendants "are liable only for the loss of income caused by the defamatory publication," but are not liable for the loss of income due to other factors. *Id.* at 432, 658 S.W.2d at 403. We further found in *Wasp Oil* that the loss of income was not established with any exactness, but even if it was, the trial court "could not determine what part of the loss of income was caused solely by the defamatory letter." *Id.*

In response, Dodson argues that Allstate failed to raise the argument of other causes in connection with the testimony described before the trial court. In its

motion for directed verdict, and later in its motion for judgment notwithstanding the verdict (JNOV), Allstate did present the argument that there were other possible causes for Dodson's loss of income. However, Allstate never made the argument that Dodson must eliminate all other possible causes before being able to recover damages. Even in its motion for directed verdict and motion for JNOV, Allstate only points to Robert Cortinez's testimony concerning patients having their own HMOs and being directed to physical therapists within their HMO network rather than being referred to Dodson and the testimony that the number of personal injury soft-tissue claims decreased in the 1990s as other possible explanations for Dodson's decline in income. Allstate makes no reference to the other five potential causes that are argued on appeal. This court has frequently held that it will not consider arguments on appeal that were not presented to the trial court. *See Gilliam*, 313 Ark. at 701, 856 S.W.2d at 879. And even with respect to the HMO network and the decline in soft-tissue injury cases, which are suggested causes, the issue of causation is a fact question for the jury to decide, as already stated.

Allstate continues that even if Dodson put on substantial evidence of causation, this evidence did not support the $6 million compensatory damages award. And yet, this court in *Baptist Health v. Murphy*, 2010 Ark. 358, 373 S.W.3d 269, permitted recovery on the theory of tortious interference where the plaintiff put on evidence that in at least one instance, he was precluded from treating a patient and lost the professional fees associated with that treatment and that the plaintiff was harmed because he was less likely to receive referrals. In the instant case, much more evidence was presented by Dodson of the chilling effect Allstate representatives had on his practice due to their contact with his patients.

Furthermore, unlike in *Wasp Oil* where there was no evidence introduced of tax returns, books of account, or projections of lost income, Dr. Charles Venus testified on behalf of Dodson as to his loss of income between the years of 1993 and 2007. Dr. Venus calculated that had Dodson's income remained constant over this period of fourteen years, his cumulative loss would have been $8,779,645.00. Dr. Venus also testified that if Dodson's income had increased by five percent each year, his cumulative loss of income would have been $14,633,336.00. He testified that he calculated this cumulative loss in income from Dodson's income-tax returns.

Based on this testimony, we conclude that there was substantial evidence to support the jury's verdict for compensatory damages. We further hold that this compensatory-damage award of $6 million does not shock the conscience of this court or demonstrate passion or prejudice on the part of the jury, especially in light of Dr. Venus's testimony estimating Dodson's lost profits to be between $8 million and $14 million. We affirm the jury's verdict for compensatory damages in the amount of $6 million.

### III. *Expert Testimony*

Allstate next contends that the trial court erred in allowing Dodson's insurance-industry expert from Nevada, Gary Fye, to testify concerning Allstate's nationwide practice of deliberately low-balling small insurance claims for bodily injury and taking advantage of financially-vulnerable personal-injury victims. Allstate argues that this testimony was irrelevant, inflammatory, and improper and should have been excluded. In response, Dodson argues that Allstate did not make the proper objections to this testimony at trial.

Dodson further argues that the arguments presented by Allstate on appeal were not presented to the trial court, and, thus, this court should not consider them.

■ Initially, we reject Dodson's claim that Allstate failed to make the proper objections during Fye's testimony and failed to present the arguments presented on appeal concerning the admissibility of Fye's testimony at the time of trial. As Allstate underscores, it filed a motion in limine seeking to exclude Fye's testimony prior to trial. This court has frequently observed that where a pretrial motion in limine has been denied, the issue is preserved for appeal, and no further objection at trial is necessary. *See, e.g., Morris v. State*, 358 Ark. 455, 193 S.W.3d 243 (2004). Furthermore, Allstate objected throughout Fye's entire testimony, and at several points objected to Dodson's failure to lay a proper foundation and failure to connect the documents to which he was testifying to Arkansas and to Dodson. Allstate further argued in its motion for new trial that Fye's testimony should have been excluded because he impermissibly testified to Allstate's motive, intent, and thought processes and because his testimony concerning Allstate's nationwide practices enticed the jury to punish Allstate for being a bad company. We hold that Allstate properly preserved this issue for appeal.

■ This court reviews the admissibility of expert testimony under an abuse-of-discretion standard. *See Green v. Alpharma, Inc.*, 373 Ark. 378, 397, 284 S.W.3d 29, 43 (2008). Arkansas Rule of Evidence 702 allows an expert who is qualified by knowledge, skill, experience, training, or education to testify to his or her scientific, technical, or specialized knowledge that would assist the trier of fact in understanding the evidence or determining a fact in issue.

Fye testified that in his opinion, the national claims practices of Allstate did relate to Dodson's case. Three categories of national claims practices, he stated, were involved: (1) training for identifying and handling suspicious or potentially fraudulent bodily-injury claims; (2) practices referred to by Allstate as indemnity-control initiatives; and (3) the implementation of Allstate's training manual that lays out the core principals and practices for settlements.

■ Allstate responds to this by contending that Fye did not have knowledge of what Allstate did in Arkansas with respect to claimants who were patients of Dodson. Allstate further contends that what it may or may not have been doing in other states was irrelevant to this case. The trial court ruled that Fye would be permitted to testify and that these issues raised by Allstate would go to the weight of his testimony rather than to its admissibility.

Fye's testimony included reference to a study of Allstate's core practices that showed that claimants not represented by attorneys received less in settlements than claimants who were represented by attorneys. Fye also testified that it was Allstate's goal to control loss payout, especially on bodily-injury claims of small to medium size. He added that it was Allstate's national practice to utilize a computer program (Colossus) to calculate a range of settlement values for claims involving minor impact, soft-tissue injuries and make settlement offers in the lowest ten percent of that range. If the claimants did not want to settle, then they would be forced into a lawsuit. Claim adjusters, he said, are being trained in "trial economics," which concerns whether it is economically feasible for an attorney to take on the costs of prosecuting a soft-tissue injury case. He testified that All-

state's claims program sends a message to claimants and lawyers who consider taking claims to court that the majority of claims for small to medium soft-tissue injuries settle for less than ten thousand dollars. Based on his observation of industry standards over the past fifty years, Fye opined that Allstate violated those industry standards by identifying a successful medical practice that was providing assistance to persons with soft-tissue injuries and intervening to curb that practice in order to reduce claims.

Allstate urges once more on appeal that the testimony presented by Fye was irrelevant and inflammatory. Allstate concludes that Fye impermissibly told the jury which result to reach and testified about Allstate's motives, intent, and thought processes. Although Allstate cites authority for the proposition that an expert may not tell the jury what result to reach or testify as to the defendant's motives, intent, or thought process, it fails to identify those portions of Fye's actual testimony which support violation of that principle.

Allstate does contend Fye did not relate his testimony concerning Allstate's documents and national policies to Dodson, or to physical therapy, or to a physician's use of unlicensed employees to perform physical therapy in Arkansas. Allstate emphasizes that the trial court commented after the jury verdict had been returned that Dodson's counsel "tried to get evidence in that [the court] didn't think was directly related. That is, [the court] understand[s] [Dodson's counsel], and many other attorneys, have all kinds of problems with Allstate and the colossus system and all their things, not all of which [the court] felt were . . . well, very little of which [the court] thought was relevant to this case."

Despite the trial court's voiced concern about the extent of Fye's testimony and relevancy, we are of a mind that Fye's testimony sufficiently related to Allstate's course of conduct regarding Dodson. While the Colossus computer program and claim practices did not relate only to physical-therapy claims, it did illustrate a program of economic warfare regarding small soft-tissue-bodily-injury claims, including physical-therapy claims, and potential litigation. It further depicted a willingness on the part of Allstate to use low benefit offers and the threat of protracted litigation as tools to discourage these small claims. Denial of claims for Dodson's unlicensed physical therapists' work could easily be viewed as falling within the parameters of Allstate's overall strategy to curtail soft-tissue claims. Legitimate cost-saving measures are one thing; a protracted campaign to limit and even shut down a physician's business is another. We hold that there was a sufficient connection between Fye's testimony of national practices and the Dodson scenario for the testimony to have some relevancy. The trial court did not abuse its discretion on this point.

### IV. *Joint and Several Liability*

Allstate next claims that it cannot be held jointly and severally liable for the tort of defamation, because there was evidence presented at trial that other insurance companies were making the same slanderous statements that Allstate was making. It urges that it was held jointly and severally liable for all of the damages suffered by Dodson when there was no distinction made between the damages suffered by Dodson due to Allstate's statements and those made due to the conduct of the other insurance companies. Dodson correctly argues that Allstate made no objection to the jury instructions offered on damages and made no proffer of an instruction or interrogatory on this issue it now advances on appeal.

This court has stated that where a general verdict form is used, we will not speculate on what the jury found. *Hyden v. Highcouch, Inc.*, 353 Ark. 609, 614, 110 S.W.3d 760, 764 (2003). Further, "[w]hen special interrogatories concerning liability or damages are not requested, this court is left in the position of not knowing the basis for the jury's verdict, and this court will not question nor theorize about the jury's findings." *Id.* at 614–15, 110 S.W.3d at 764.

In the instant case, a general-verdict form was used, and there were no special interrogatories requested by Allstate. It is impossible for this court to determine whether the jury held Allstate jointly and severally liable for all of Dodson's damages caused either by Allstate or the actions of other insurance companies. It was incumbent upon Allstate to request a specific instruction concerning this issue or request that a special interrogatory be included on the jury-verdict form. This was not done, and for that reason, we decline to address this issue.

## V. *Withdrawn Counterclaim*

Allstate contends that Dodson improperly used its withdrawn counterclaim as substantive evidence after this court in *Dodson I* held that the counterclaim could be used as impeachment evidence. Dodson responds by arguing that the counterclaim was used only as impeachment evidence and, thus, was proper.

In *Dodson I*, this court held that Allstate's withdrawn counterclaim qualified "as impeachment evidence to show that despite Allstate's stance at trial that it never asserted that Dodson had done anything wrong, Allstate's own pleadings indicated that they believed Dodson was acting fraudulently." 345 Ark. at 451, 47 S.W.3d at 880. This court reasoned that the use of the counterclaim as impeach-

ment evidence was permissible because "Dodson was not attempting to admit his own pleading to bolster his claims, but instead attempted to admit a filed and dismissed pleading adopted by all of the defendants." *Id.* at 450, 47 S.W.3d at 880.

In the instant case, Dodson did use the withdrawn counterclaim for impeachment purposes during the testimony of John Runkle. Nevertheless, when Dodson testified on direct that there was a counterclaim filed against him that accused him of criminal wrongdoing and fraud, Allstate objected and Dodson's counsel agreed to save this line of questioning for another time. Dodson's counsel then asked Dodson what he believed constituted the defamation in this case, to which Dodson responded: "the continuing even current accusations of fraudulent activity, criminal activity, activities subject to prosecution with fines and imprisonment and the, the continuing presentation of these accusations to the public of Pulaski and Jefferson county in the courts of law...."

Dodson does not specifically mention the counterclaim in this later testimony, but he makes it clear that he believes accusations of fraud and criminal activity were presented to the public by Allstate through the courts. Without a specific reference to the pleading, however, we are reluctant to find reversible error on this point or to find a direct contravention of this court's holding in *Dodson I*.

## VI. *Punitive Damages*

Allstate asserts that there was insufficient evidence to support an award for punitive damages. Alternatively, Allstate argues that even if this court finds there was sufficient evidence to support a punitive-damage award, that award should be reduced.

This court has previously set forth the standards to determine whether there was sufficient evidence to support a punitive-damages award:

> When reviewing a punitive damage award under Arkansas common law, "we consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party." *Ellis*, 337 Ark. at 551, 990 S.W.2d at 548. Punitive damages are to be a penalty for conduct that is malicious or done with the deliberate intent to injure another. *Id.* We have also held that "where, in light of the evidence, the jury could have concluded that appellants displayed a conscious indifference for appellee and that their acts were done with the deliberate intent to injure her, the amount of punitive damages did not shock our conscience." *Id.* When conducting our review of an award of punitive damages, we view the evidence in the light most favorable to the appellee. *E.g., Houston v. Knoedl*, 329 Ark. 91, 947 S.W.2d 745 (1997).

*See Bank of Eureka Springs v. Evans*, 353 Ark. 438, 456–57, 109 S.W.3d 672, 683 (2003).

▇▇ This opinion already recounts the testimony of former patients Regina Coates, Paulette Bassett, Mikal Rasul, Henry Bassett, and Melvin Baines, concerning disparaging comments made by Allstate adjusters. We reiterate the testimony of Peter Miller, who testified that he had a conversation with Waddell, Allstate's adjuster, where he advised her that there was a law that specifically said a doctor may have non-licensed physical therapists as long as those therapists were under the direct supervision of the doctor. Miller testified that in his experience, Allstate has always been innovative in finding ways not to pay injured people. One of these ways was to make it unattractive to deal with certain doctors, which is what happened to Dodson, and after awhile other insurance companies began doing the same thing.

Robert Cortinez, the general-practice attorney in Little Rock and Pine Bluff, testified that Dodson would treat some of his personal-injury clients. He testified that in 1994 or 1995, Allstate began making allegations that Dodson was using an unlicensed physical therapist, that this was illegal, and that they were not going to pay for that type of treatment. He testified that Allstate adjusters said Dodson would not be in business much longer. Michael Crockett, a personal-injury attorney in Little Rock, testified that after 1994 and 1995, it became difficult to get cases settled with Allstate as long as Dodson was on the other side. He testified that Allstate was attacking Dodson's credibility on billing because he did not have licensed physical therapists, which Allstate said was required. He stopped referring cases to Dodson when Allstate was on the other side because it was not in the best interest of his clients.

Sheila Campbell, a lawyer, testified that Runkle, Allstate's adjuster, told her that Allstate would no longer pay Dodson's bills because he was fraudulently billing due to the fact that he did not have a licensed physical therapist in his office. She testified that she concluded that the Physical Therapy Act had nothing to do with the Medical Practices Act under which Dodson was licensed and reported her conclusions to Allstate. She testified that Allstate responded that they were doing what their attorney told them to do. She added that Allstate still refused to pay Dodson's bills after the medical board's attorney issued his opinion in 1997.

Allstate counters that this is not a punitive-damages case due to the absence of malicious intent. It emphasizes (1) that the question of the legality of Dodson's use of unlicensed personnel was an open question in Arkansas and that the only law on point came from an Attorney General opinion that Allstate maintains supports its position; (2) that other jurisdictions have adopted a position similar to Allstate's regarding unlicensed personnel; (3) that it presented evidence at trial that its position regarding Dodson's use of unlicensed personnel was based on a legal opinion rendered by independent counsel; (4) that it received information from the Arkansas State Board of Physical Therapy that licensure is required for individuals providing physical-therapy services; (5) that there was no evidence of tortious conduct on the part of Allstate introduced at trial; (6) that several other insurance companies took the same position and refused to pay for treatment performed by Dodson's unlicensed employees; and (7) that the punitive-damages award should be vacated because Fye, Dodson's expert, was permitted to testify to Allstate's nationwide practices, which, Allstate underscores, did not relate to Dodson, physical therapy, or the use of unlicensed personnel.

Viewing this evidence in the light most favorable to Dodson, there is sufficient evidence to support a finding by the jury that Allstate, in its continued statements made by its representatives to Dodson's patients and attorneys that worked with Dodson, acted with malice. There was ample evidence presented that Allstate went beyond merely refusing to pay for physical therapy performed at Dodson's clinic by unlicensed employees. As recited above, several patients and attorneys testified that Allstate agents not only refused to pay physical-therapy claims but also repeatedly told them that Dodson was running an illegal and fraudulent practice.

The enormity of the wrong is great enough to support punitive damages, considering that Allstate continued this conduct over a period of several years resulting in severe damages to Dodson's reputation and medical practice. Also supportive of the assessment of punitive damages is the fact that this course of conduct was taken by a nationally recognized insurance agency and, apparently, in accordance with their national claims practices and procedures to curb small, soft-tissue claims. The evidence presented in this case was such that a jury could have concluded that the acts committed by Allstate were pursued with a conscious indifference for Dodson and with deliberate intent to injure him. After considering all of the circumstances, we conclude that awarding punitive damages does not shock the conscience of this court. The question is the appropriate amount of those damages, and we will discuss this as a part of the cross-appeal.

## VII.  *Cross–Appeal*

Cross-appellant Dodson argues that the original punitive-damage award of $15 million was appropriate and not excessive and that the trial court should be reversed on this point. He argues that Allstate's conduct was outrageously reprehensible and that the ratio between the compensatory and punitive damages was within an acceptable range. Allstate responds that its conduct was not outrageously reprehensible, especially when viewed in contrast to the facts of other Arkansas cases where this court upheld similar awards. Allstate additionally contends that the punitive-damage award was excessive considering the high amount of compensatory damages awarded and in light of comparable civil penalties.

An analysis of an award of punitive damages is reviewed in a two-step

process: first, whether the award is consistent with state law, and second, whether it violates the Due Process Clause, as analyzed by the United States Supreme Court in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). *See Routh Wrecker Serv. v. Washington,* 335 Ark. 232, 240, 980 S.W.2d 240, 244 (1998).

This court has previously stated the law in Arkansas relating to remittitur of punitive damages:

> When considering the issue of remittitur of punitive damages, we review the issue *de novo. See Smith v. Hansen,* 323 Ark. 188, 914 S.W.2d 285 (1996). We consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. *See United Ins. Co. of America v. Murphy,* 331 Ark. 364, 961 S.W.2d 752 (1998); [*Harold*] *McLaughlin* [*Truck Brokers*] *v. Cox,* 324 Ark. 361, 922 S.W.2d 327 (1996). Punitive damages are a penalty for conduct that is malicious or perpetrated with the deliberate intent to injure another. *See United Ins. Co., supra.* When punitive damages are alleged to be excessive, we review the proof and all reasonable inferences in the light most favorable to the appellees, and we determine whether the verdict is so great as to shock the conscience of this court or to demonstrate passion or prejudice on the part of the trier of fact. *See Houston v. Knoedl,* 329 Ark. 91, 947 S.W.2d 745 (1997); *Collins v. Hinton,* 327 Ark. 159, 937 S.W.2d 164 (1997). It is important that the punitive damages be sufficient to deter others from comparable conduct in the future. *See McLaughlin v. Cox, supra.*

*Advocat, Inc.,* 353 Ark. at 50, 111 S.W.3d at 357–58 (citing *Routh Wrecker Serv.,* 335 Ark. at 240–41, 980 S.W.2d at 244).

■ We begin by holding that the punitive-damage award of $15 million awarded by the jury does not shock the conscience of this court. We review the remittitur issue de novo, and as already discussed in this opinion, testimony abounded of Allstate's efforts to tag Dodson as one engaged in a fraudulent and illegal practice. The clear goal was to curtail Dodson's claims and, according to one witness, to shut his business down. That testimony easily supports the jury's verdict on punitive damages.

We turn next to the question of whether Allstate's Due Process rights were violated. The U.S. Supreme Court has set out three guideposts to be considered when determining whether a punitive-damages award is excessive: (1) the degree of reprehensibility; (2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damage award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *BMW of North America, Inc. v. Gore, supra.* An analysis of the factors set out in *Gore* for remittitur purposes is also performed by the appellate court by using a de novo review. *Advocat, Inc.,* 353 Ark. at 53, 111 S.W.3d at 360.

A. Degree of Reprehensibility

■ When analyzing the degree of reprehensibility, the Court in *Gore* said that "exemplary damages imposed on a defendant should reflect 'the enormity of his offense.'" *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. In discussing reprehensibility, this court has said:

> (1) where the harm inflicted by the tortfeasor was "purely economical in nature[,]" (2) there was no evidence that

the tortfeasor had acted in bad faith, (3) there was no evidence that the tortfeasor had "persisted in a course of conduct after it had been adjudged unlawful on even one occasion, let alone repeated occasions[,]" and (4) the record failed to disclose any "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive," the tortfeasor's conduct was not sufficiently reprehensible to warrant the imposition of a $2 million award.

*Advocat, Inc.*, 353 Ark. at 54, 111 S.W.3d at 360 (citing *Gore*, 517 U.S. at 576–80, 116 S.Ct. 1589).

The United States Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), elaborated on the factors to be considered when assessing reprehensibility: "whether[ ] the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Campbell*, 538 U.S. at 419, 123 S.Ct. 1513.

In *Gore*, the Court said that when considering the degree of reprehensibility in light of economic harm, "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct ... or when the target is financially vulnerable, can warrant a substantial penalty." *Gore*, 517 U.S. at 576, 116 S.Ct. 1589. But the Court added that this "does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages." *Id.*

In the instant case, most of the evidence presented reflected that the harm caused to Dodson was economic harm through lost profits. Although the harm inflicted on Dodson was purely economic, the alleged harm to his practice was substantial. To repeat in part, Dr. Charles Venus testified that he estimated Dodson's lost profits to be between $8 million and over $14 million, depending on whether it was calculated to include a five percent increase in income each year. The evidence presented also showed that Allstate representatives had made statements concerning Dodson's "illegal practice" and "fraudulent practice" to several patients and attorneys and that these statements were repeated over several years, even after Allstate received the letter from counsel for the Arkansas Medical Board in 1997. More than a reasonable effort to control claims costs, Allstate appears to have sought to severely limit a medical practice that was costing it money. Based on this evidence, we conclude that the reprehensibility of Allstate's conduct in this case warranted an award of punitive damages.

## B. Ratio

The Court in *Gore* stated that it was reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive-damage award. *See Gore*, 517 U.S. at 582, 116 S.Ct. 1589. In *Campbell*, the Court again declined to impose a bright-line ratio which a punitive-damage award cannot exceed. *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513. The Court did indicate in *Campbell* that its jurisprudence has established that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* The Court went on to say that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost

limit of the due process guarantee." *Id.* The Court concluded that the exact reward in each case still must be determined by the circumstances surrounding the defendant's conduct and the harm caused to the plaintiff. *Id.*

Turning to the facts of the instant case, the jury awarded Dodson $6 million in compensatory damages and $15 million in punitive damages. The ratio between the punitive and compensatory damages was 2.5:1. This ratio does not approach the shocking ratio of 145:1, which was the award in *Campbell.*

$|_{32}$We are reminded again on this issue by Allstate that Dodson's expert, Gary Fye, testified to Allstate's national practices regarding claims settlement and that it is being punished for those practices and not for conduct perpetrated in Arkansas. Again, we disagree that Allstate's conduct testified to by Fye did not have some nexus to the specific harm suffered by Dodson. That is what the Court required in *Campbell*—a sufficient nexus. *Id.* at 422, 123 S.Ct. 1513. Our conclusion is bolstered by the fact that the 145:1 ratio in *Campbell* manifestly evidenced punishment for running an "unsavory" business nationally as opposed to the 2.5:1 ratio in the instant case, which corresponds more directly to its conduct in Arkansas relating to Dodson's soft-tissue practice.

The trial court appeared to be influenced in its grant of the remittitur by the case of *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), where the ratio of punitive damages to compensatory damages was one to one. The *Exxon* case is not apposite in our judgment. There, the award of compensatory damages was $507.5 million and a punishment in a comparable amount was significant punishment, as the Court itself acknowledged. In the case before us, that is not the situation.

### C. Comparable Civil Penalties

The third guidepost as set out in *Gore* is the disparity between the punitive-damages award and the "civil penalties authorized in comparable cases." *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. The Arkansas Deceptive Trade Practices Act defines defamation when made in the business of insurance as an unfair method of competition and an unfair or deceptive act or practice. Ark.Code Ann. § 23–66–206(3). A penalty of up to $10,000 *per act of violation* is permitted under $|_{33}$this act. *See* Ark.Code Ann. § 23–66–211(1). Clearly, under this standard, the initial jury award of $15 million would be excessive. Nevertheless, when balanced against the reprehensibility of the conduct and the ratio of punitive to compensatory damages of only 2.5:1, we fail to see a Due Process violation under the *Gore* standards in the jury's award of $15 million in punitive damages. We reverse the trial court on cross-appeal.

Affirmed on direct appeal. Reversed on cross-appeal.

HANNAH, C.J., and CORBIN, J., dissent.

JIM HANNAH, Chief Justice, dissenting.

I respectfully dissent. The special jury instructions were improper and deprived Allstate of a fair trial by essentially telling the jury what decision to reach. Allstate made valid objections to the special jury instructions which apprised the circuit court of the alleged error and permitted the circuit court to correct that error. This case should be reversed based on the jury instructions alone. The AMI instructions were sufficient, and this court should stand by its precedent of requiring use of AMI instructions except when they are wholly inadequate.

Further, while Dodson offered evidence, including the testimony of patients and lawyers, to show that the earnings from his practice had diminished, this evidence did not establish that Allstate was the cause. Also, Gary Fye's testimony was wholly irrelevant because at issue in this case were statements of local employees, yet Fye testified about alleged national policies. His opinions of alleged national policy only confused the jury further. He should not have been permitted to testify as an expert. Because I conclude there was a lack of evidence of causation, submission of the case to the jury was error. The jury decision in this case was based on speculation and conjecture.

I also note that on the former appeal, see *Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 47 S.W.3d 866 (2001), this court held that the withdrawn counterclaim was admissible to impeach Allstate on the claim that it had never asserted that Dodson had done anything wrong. It was not held to be admissible as evidence of defamation. The counterclaim was used as evidence of defamation in the present trial; however, I do not conclude that its admission constituted reversible error.

Therefore, I dissent. I would reverse and remand this case.

CORBIN, J., joins.