2013 Ark. 173

STATE of Arkansas, DEPARTMENT OF CAREER EDUCATION, DIVISION OF REHABILITATION SERVICES, Appellant

v.

Bob L. MEANS, Appellee.

No. 12–723.

Supreme Court of Arkansas.

April 25, 2013.

Dustin McDaniel, Att'y Gen., by: Colin R. Jorgensen, Ass't Att'y Gen., for appellant.

D. Scott Hickman, for appellee.

DONALD L. CORBIN, Justice.

Appellant State of Arkansas, Department of Career Education, Division of Rehabilitation Services ("ARS") appeals an order of the Garland County Circuit Court in favor of Appellee Bob L. Means. On appeal, ARS asserts that the circuit court erred (1) in ruling that Means was a "public employee" as a matter of law; (2) in denying its motion for a directed verdict; (3) in failing to instruct the jury on mitigation of damages; and (4) in denying its motion for new trial or, alternatively, motion for remittitur. Pursuant to Ark. Sup. Ct. R. 1–2(b)(6) (2012), this court assumed jurisdiction of this appeal, as it involves an issue of statutory interpretation. We find no error and affirm.

ARS is a state agency charged with providing opportunities for Arkansans with disabilities to lead productive and independent lives. Means, a licensed psychologist, contracted with ARS to provide psychological and other services on a part-time basis. In 2004, Means contracted with ARS to provide counseling and psychotherapy to the students and clients at the Hot Springs Rehabilitation Center ("HSRC").[1] According to Means, his contract was renewed approximately twelve times. His last contract, which ran from July 1, 2007, to June 30, 2009, was renewable for seven years by agreement of both parties.

In 2008, Means contacted the United States Office of the Inspector General ("OIG") to report his observations that federal funds were being illegally used. According to his original complaint, seventy percent of ARS's funds were from the federal government. The OIG subsequently requested Means to gather additional information. A few days later, Means received a phone call from Robert Trevino, commissioner for ARS, who informed Means that his services were being immediately terminated because ARS was implementing "a new counseling model."

---

1. From 1971 until 2004, Means, as a faculty member with the University of Arkansas, worked with ARS through funding from a grant program. When that funding ended, Means contracted with ARS to provide services at HSRC.

Thereafter, Means filed the instant action, pursuant to the Arkansas Whistle–Blower Act, alleging that he was terminated as a result of his report to the OIG. Means sought injunctive relief, reinstatement of his employment, benefits, and retirement-service credit, as well as compensation for lost wages and benefits. ARS responded with a motion to dismiss arguing, inter alia, that Means had failed to state a prima facie claim under the Whistle–Blower Act because he did not engage in the protected activity contemplated by the statute, nor did he report a claim to the "appropriate authority" as defined in the Act.

Means subsequently amended his complaint, asserting that he also communicated the alleged waste to his supervisor, Debbie Coleman, the office of the Governor, a member of the State Senate, as well as the OIG. ARS again moved to dismiss the action, but the circuit court denied the motion by order entered March 4, 2010.

ARS moved for summary judgment on July 11, 2011, asserting that Means could not meet the elements to support a claim under the Whistle–Blower Act. Specifically, ARS argued that Means could not establish (1) that he was a "public employee," (2) that he communicated the alleged waste to an "appropriate authority," or (3) that ARS took an "adverse action" against him because of his whistle-blower communication. The circuit court denied the motion for summary judgment, finding that an independent contractor, such as Means, could bring a claim under the Whistle–Blower Act and that there were material questions of fact as to whether Means communicated the alleged waste to an appropriate authority and whether ARS terminated him as a result of such communication.

A jury trial was held on January 19–20, 2012. Means testified that he became concerned about a relationship between the HSRC and John Doe.[2] Means stated that John Doe had completed his rehabilitation training but did not want to leave the center, even though placement was available for him. According to Means, once John Doe completed his training, he was no longer qualified for services at the center. But, despite this, Means stated that John Doe continued receiving expensive services, including housing, food, and transportation. Means considered these expenditures to be illegal. Means further testified that he was aware of the acronym "PMS," as used within the HSRC, to mean "politically mandated service." According to Means, this meant that from somewhere up the chain of command, a decision was made to allow a person to stay as long as they wanted, without proper review or justification for doing so. Means testified that the day he received word to allow John Doe to stay as long as he wanted, he informed his immediate supervisor, Deborah Coleman, that it was illegal to allow him to stay. He stated that Coleman responded that it was wrong, but she did not know if it was illegal. According to Means, he began to research the matter and contacted several others to communicate his concern. He stated that he contacted his local senator, Terry Smith, as well as the Rehabilitation Services Administration in Washington, D.C., and the OIG.

On cross-examination, Means stated that his contract with ARS included language that he was an independent contractor, not an employee, and that ARS could not exercise any managerial responsibility over him. He also admitted that while he orally communicated his concern to Coleman, he did not provide any written documentation

---

2. Means referred to his patient as John Doe to protect the patient's privacy.

to her, although he did provide such documents to the Rehabilitation Services Administration and the Inspector General.

ARS moved for a directed verdict, arguing among other things, that Means could not prove his cause of action under the Whistle–Blower Act because he was not a public employee as required by the Act. ARS further argued that Means could not prove his claim because he did not report the alleged waste to an appropriate authority as required by the Act. |₅The circuit court denied the motions, and the case was submitted to the jury. The jury returned a verdict in favor of Means for $110,452.

At the conclusion of the trial, ARS moved for a new trial or, alternatively, remittitur. Therein, ARS argued that it was entitled to a new trial because the jury's verdict constituted excessive damages resulting from the influence of passion or prejudice and constituted an error in the amount of recovery by the jury. More specifically, ARS argued that the jury erroneously awarded damages beyond the end date of the contract between the parties. The circuit court subsequently entered judgment in favor of Means on February 17, 2012, awarding damages of $110,452 and costs of $510. From that order comes the instant appeal.

ARS first argues that the circuit court erred in ruling that Means was a "public employee" as a matter of law and taking this factual question from the jury. Specifically, ARS asserts that the circuit court erred in denying its motion for summary judgment because Means could not establish a valid claim under the Whistle–Blower Act, as he was not a "public employee" as defined in Ark.Code Ann. § 21–1–602(4) (Supp.2011). Moreover, ARS argues that the circuit court erred in instructing the jury that Means was a "public employee" as a matter of law. Means responds, asserting that the circuit court correctly determined that he was a public employee for purposes of the Whistle–Blower Act and properly instructed the jury accordingly, as there was no question of fact in this regard.

■■■ Our standard of review for a denial of a directed-verdict motion is well settled:

> [I]n reviewing the denial of a motion for [a directed verdict], we will reverse only if there is no substantial evidence to support the jury's verdict, and the moving party is entitled to judgment as a matter of law. Substantial evidence is that which goes beyond |₆suspicion or conjecture and is sufficient to compel a conclusion one way or the other. It is not our place to try issues of fact; we simply review the record for substantial evidence to support the jury's verdict. In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. A motion for directed verdict should be denied when there is conflict in the evidence, or when the evidence is such that fair-minded people might reach different conclusions.

*Bedell v. Williams*, 2012 Ark. 75, at 5, 386 S.W.3d 493, 498 (quoting *Carter v. Cline*, 2011 Ark. 474, at 10, 385 S.W.3d 745, 752).

Public employees who report violations of law or waste of public funds to the appropriate authorities are afforded protection under this state's Whistle–Blower Act. *Crawford Cnty. v. Jones*, 365 Ark. 585, 232 S.W.3d 433 (2006). The Arkansas Whistle–Blower Act is codified at Ark. Code Ann. §§ 21–1–601 to –608 (Repl.2004 & Supp.2011). Section 21–1–603 provides in relevant part that

(a)(1) A public employer shall not take adverse action against a public employee because the public employee ... communicates in good faith to an appropriate authority:

(A) The existence of waste of public funds ... or ...

(B) A violation or suspected violation of a law, rule, or regulation adopted under the law of this state or a political subdivision of the state.

(2) The communication shall be made at a time and in a manner which gives the public employer reasonable notice of need to correct the waste or violation.

(b)(1) For purposes of subsection (a) of this section, a public employee communicates in good faith if there is a reasonable basis in fact for the communication of the existence of waste or of a violation.

(2) Good faith is lacking when the public employee does not have personal knowledge of a factual basis for the communication.

Ark.Code Ann. § 21–1–603(a)(1)–(b)(2). Although not defined in this section, "public employee" is defined in section 21–1–602(4) as "a person who performs a full or part-time service for wages, salary, or other renumeration for a public employer."

In support of its argument that Means was not a "public employee," ARS asserts that Means conceded at trial that he was an independent contractor and that ARS had no managerial authority over him. However, this argument is unpersuasive in light of the definition of "public employee" in section 21–1–602(4). Means is a person, and it is undisputed that he performed part-time services in exchange for wages from ARS, a public employer. Clearly, there was sufficient evidence that he was a public employee, and we cannot say that the circuit court erred in denying ARS's motion for directed verdict.

In that same vein, we cannot say that the circuit court erred in instructing the jury as a matter of law that Means was a public employee. A party is entitled to a jury instruction when it is a correct statement of the law and there is some basis in the evidence to support giving the instruction. *Allstate Ins. Co. v. Dodson*, 2011 Ark. 19, 376 S.W.3d 414. Here, the circuit court interpreted the definition of "public employee" in accordance with the plain meaning of the statute. When a statute is clear, we give it its plain meaning. *Voltage Vehicles v. Ark. Motor Vehicle Comm'n*, 2012 Ark. 386, 424 S.W.3d 281. There was simply not a question of fact that should have been submitted to the jury for resolution.

ARS next argues that the circuit court erred in denying its motion for a directed verdict because Means presented no evidence that he reported his allegations to an "appropriate authority." According to ARS, Means's testimony that he reported the alleged waste to Deborah Coleman, his immediate supervisor, is insufficient because Coleman is not an "appropriate authority" under section 21–1–602(2)(A). Means counters that the State's argument fails because, clearly, Coleman was an "appropriate authority" under the statute. Moreover, Means asserts that if the statute is interpreted in the manner advanced by the State, it will lead to an absurd result.

One of the prerequisites to bringing a claim under the Whistle–Blower Act is that an employee must communicate any alleged waste to an "appropriate authority." Section 21–1–602(2)(A) provides that an "appropriate authority" includes

(i) A state, county, or municipal government department, agency, or organization having jurisdiction over criminal law enforcement, regulatory violations,

professional conduct or ethics, or waste; or

(ii) A member, officer, agent, investigator, auditor, representative or supervisory employee of the body, agency, or organization.

ARS argues that subsection (ii)'s reference to a "supervisory employee" does not encompass a supervisor of a whistle-blower within the whistle-blower's agency. According to ARS, a "supervisory employee" within this definition refers to a supervisory employee within a state, county, or municipal government department, agency, or organization that has jurisdiction over law enforcement, regulatory violations, professional conduct, or waste. Thus, under ARS's interpretation of the statute, Means should have communicated the alleged waste to the State's auditor, the Arkansas Ethics Commission, any prosecuting attorney, or ARS's commissioner or director.

In support of this argument, ARS relies on this court's decision in *Jones*, 365 Ark. 585, 232 S.W.3d 433, wherein this court addressed the issue of an "appropriate authority" under the Whistle–Blower Act. In that case, Jones, who was a public employee, reported allegations of alleged waste to her immediate supervisor, who was the county assessor, and to members of the county's quorum court. In reviewing the circuit court's grant of a directed verdict in favor of Crawford County on the whistle-blower claim, this court stated that the issue to be resolved "[was] whether Jones's actions of reporting alleged misdeeds to quorum court members constituted reporting to the 'appropriate authorities.'" *Id.* at 596, 232 S.W.3d at 442. According to ARS, this court's silence on the issue of whether Jones's supervisor was an "appropriate authority" indicates that a whistle-blower's supervisor does not constitute an "appropriate authority." We disagree.

It is true that we did not analyze whether Jones's supervisor was an "appropriate authority," but we certainly never held that an immediate supervisor was not an "appropriate authority." In fact, in addressing the issue, this court noted that in response to Crawford County's motion for directed verdict, Jones "countered that she had presented evidence that she complained to members of the quorum court." *Id.* at 595, 232 S.W.3d at 441. Thus, while we summarized Jones's testimony that she told her supervisor and members of the quorum court about the alleged waste, we addressed the issue that was raised at the circuit court, namely that Jones had communicated allegations of waste to members of the quorum court. Thus, our decision in *Jones* is inapposite to the present case.

Turning back to the language of section 21–1–602(2)(A), we cannot interpret it in the manner advanced by ARS. It is a well-settled principle of statutory interpretation that this court first construes a statute just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Wal–Mart Stores, Inc. v. D.A.N. Joint Venture III, L.P.*, 374 Ark. 489, 288 S.W.3d 627 (2008). When the language of a statute is plain and unambiguous, conveying a clear and definite meaning, the court does not resort to the rules of statutory construction. *Id.* Here, the plain language of the statute indicates that subsection (2)(A)(i) lists departments or agencies that qualify as an "appropriate authority." At the end of that subsection appears the word "or." Then subsection (2)(A)(ii) follows and lists persons who qualify as an "appropriate authority." In its ordinary sense, the word "or" is a disjunctive particle that marks an alternative, generally corresponding to "either," as "either this or that"; it is a connective that marks an alternative. *Brown v. Kelton*, 2011 Ark.

93, at 4–5, 380 S.W.3d 361, 364 (citing *McCoy v. Walker*, 317 Ark. 86, 89, 876 S.W.2d 252, 254 (1994)). Clearly, an "appropriate authority" may be one of those listed in subsection (2)(A)(i) or it may also include, as set forth in subsection (2)(A)(ii) a member, officer, agency, investigator, auditor, representative or supervisory employee of the body, agency, or organization for which a public employee works. This interpretation is consistent with the definition of "whistle-blower" set forth in section 21–1–602(8) as "a person who witnesses or has evidence of a waste or violation while employed with a public employer and who communicates in good faith or testifies to the waste or violation, verbally or in writing, to one of the employee's superiors." To hold as ARS urges, that a public employee cannot report allegations of waste to an immediate supervisor would lead to an absurd result. This court has consistently held that it will not engage in statutory interpretations that defy common sense and produce absurd results. *See, e.g., Sluder v. Steak & Ale of Little Rock, Inc.*, 361 Ark. 267, 206 S.W.3d 213 (2005). Finally, Means testified that he also reported the alleged waste to State Senator Terry Smith, who is an appropriate authority even under ARS's suggested interpretation. Accordingly, we cannot say the circuit court erred in denying ARS's motion for directed verdict on this ground.

■ Next, ARS argues that the circuit court erred in failing to instruct the jury on mitigation of damages. Specifically, ARS asserts that Means testified that he had not sought any employment after his contract had been terminated and the issue of whether he acted reasonably in minimizing, mitigating, or avoiding damages is a question of fact that should have been submitted to the jury. Means argues to the contrary that the circuit court properly refused ARS's proffered instruction on mitigation of damages where there was no factual basis developed at trial to support such an instruction.

■ Under Arkansas law, a party is entitled to a jury instruction when it is a correct statement of the law and there is some basis in the evidence to support giving the instruction. *See Bedell*, 2012 Ark. 75, 386 S.W.3d 493. We will not reverse a circuit court's refusal to give a proffered instruction unless there was an abuse of discretion. *Id.*

Here, ARS proffered the following non-model jury instruction:

### MITIGATION OF DAMAGES

IF IT BECOMES NECESSARY FOR YOU TO ASSESS DAMAGES, THEN IN FIXING THE AMOUNT OF MONEY WHICH WILL REASONABLY AND FAIRLY COMPENSATE BOB L. MEANS, YOU ARE TO CONSIDER THAT A PARTY CANNOT RECOVER DAMAGES RESULTING FROM CONSEQUENCES WHICH HE COULD REASONABLY HAVE AVOIDED BY REASONABLE CARE, EFFORT OR EXPENDITURE.

At the time ARS proffered this instruction, Means objected. The circuit court refused the instruction, stating,

I'm not go[ing] [to] give that. I'm go[ing] [to] show that proffered. As far as I'm concerned ... there's been no proof that there is a job he failed to get. To say that he does not have a claim for damages because he may or may not have expended what a juror believes is reasonable efforts to get another job I think is entirely too speculative. There's no—if there had been evidence in the record that here was a job, he was offered a job and he refused the job, I think that might justify that instruction. But just on—placing that burden that he

also has to show that he tried to get a job diligently and didn't, are—and was unable to, I don't think that's part of his burden of proof, and I think that's what that mitigation instruction will do.

We cannot say that the circuit court abused its discretion in ruling as it did. The circuit court correctly acknowledged that it was ARS's burden to prove matters relating to mitigation. *See, e.g., Minerva Enter., Inc. v. Howlett,* 308 Ark. 291, 824 S.W.2d 377 (1992) (holding that a defendant must show that the plaintiff could have taken actions to mitigate damages and the amount of damages that might have been avoided by proper mitigation). Here, ARS failed to put forth any evidence regarding any opportunities Means may have had for further employment or any amount of damages he may have been able to avoid. While Means testified that he retired and did not apply for other jobs after his termination, he also stated that there were no jobs in his field as a rehabilitation psychologist in Garland County. Means further testified that he looked into a job at First Step School but discovered that he was not qualified. ARS put on no evidence to rebut this testimony. Thus, where there was no evidence to support giving the proffered instruction, the circuit court properly refused it.

■ ARS's final point on appeal is that the circuit court erred in denying its motion for new trial or, alternatively, remittitur. According to ARS, a new trial was warranted because Means failed to establish a prima facie claim under the Whistle-Blower Act and because the circuit court failed to instruct the jury on mitigation of damages. Alternatively, ARS asserts that the damages award was excessive and not supported by substantial evidence. Means counters that ARS's arguments are not preserved for appellate review. We agree with Means that this court cannot address

the merits of these arguments but for a different reason.

In discussing this point in its brief to this court, ARS states, "The trial court denied the post-trial motion by letter which does not appear in the record, and the motion was deemed denied when the trial court entered a Judgment in favor of Appellee for the sum of $110,452 plus $510 in costs on February 17, 2012." Thus, ARS gives the impression that there was no formal ruling on the posttrial motion and that it was deemed denied by virtue of the fact that the circuit court subsequently entered judgment in favor of Means. But, this statement by ARS conflicts with the record before us. In its notice of appeal, ARS stated that it was appealing from the February 17 judgment, as well as several intermediate orders, including "the Court's February 15, 2012 Order titled 'Motion for New Trial or Alternatively, Remittitur,' in which the Court denied the Defendant's post-trial Motion for New Trial or, alternatively, Remittitur." Moreover, in a posttrial response to a motion for attorneys' fees filed by Means, ARS stated, "Defendant notes that the Court has denied Defendant's Motion for New Trial or Alternatively, Remittitur, by Order entered February 15, 2012. Defendant intends to appeal the Court's February 15, [2012] order."

■ Clearly, ARS was aware that there was an order entered denying its motion for new trial or, alternatively, remittitur, and that the order was not included in the record. Despite being aware of the order and its absence from the record, ARS purports to appeal from a "deemed denied" ruling on its posttrial motion. The motion could not have been deemed denied when the circuit court entered an actual order denying the motion. It is axiomatic that it is Appellant's burden to bring up a record sufficient to demonstrate error by

the trial court, and we do not consider matters outside of the record. *Dodge v. Lee*, 352 Ark. 235, 100 S.W.3d 707 (2003). Where the appellant fails to meet this burden, we are compelled to affirm the trial court. *Id.* Here, where ARS was aware that an order had been omitted from the record, failed to move to supplement the record, and tried to appeal from a deemed-denied ruling that never oc-

curred, we will not address the merits of its arguments on this point.

Affirmed.