SLIP OPINION



# SUPREME COURT OF ARKANSAS

No. CV–13–986

| | |
|---|---|
| NANCY MILLSAP, AS THE SPECIAL ADMINISTRATOR OF THE ESTATE OF ROBERT NASH, DECEASED <br><br> APPELLANT <br><br> V. <br><br> VICTOR WILLIAMS, M.D. <br> APPELLEE | **Opinion Delivered** November 13, 2014 <br><br> APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, NINTH DIVISION <br> [NO. 60CV-11-1601] <br><br> HONORABLE MARY SPENCER MCGOWAN, JUDGE <br><br> <u>REVERSED AND REMANDED</u>. |

**PAUL E. DANIELSON, Associate Justice**

Appellant Nancy Millsap, as the Special Administrator of the Estate of Robert Nash, Deceased, appeals the judgment of the Pulaski County Circuit Court entered in favor of Appellee Victor Williams, M.D. On appeal, Millsap argues that (1) the circuit court abused its discretion by providing erroneous and misleading instructions to the jury concerning consent; and (2) that there was sufficient evidence from which the jury could have found that Robert Nash suffered injury as a result of undergoing a nasogastric procedure performed without proper consent. This court assumed jurisdiction of the instant appeal as involving issues needing clarification or development of the law; hence, our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(b)(5) (2014). For the reason explained herein, we reverse and remand.

Robert Nash, the father of Millsap, was diagnosed with colon cancer and was referred to Dr. Williams for surgery to remove the cancerous part of his colon. Dr. Williams admitted Mr. Nash to Baptist Medical Center in Little Rock on November 1, 2009. The next day Dr. Williams performed surgery and removed part of Mr. Nash's colon. On November 4, 2009, Dr. Williams ordered placement of a nasogastric ("NG") tube, but Mr. Nash refused the tube several times. On November 6, 2009, after Mr. Nash twice refused the tube, Dr. Williams placed the NG tube and, shortly thereafter, Mr. Nash started showing signs of medical distress and was transferred to a critical care unit for treatment. Mr. Nash remained hospitalized until his discharge on January 7, 2010. According to the allegations in Millsap's complaint, Mr. Nash required constant care and attention following his discharge until the date of his death on September 4, 2010.

Millsap filed a wrongful-death suit against Dr. Williams on April 4, 2011, alleging that he placed an NG tube against Mr. Nash's expressed wishes, and that he placed it improperly, thereby causing Mr. Nash to aspirate and eventually causing him to suffer hypoxic brain injury. In her complaint, Millsap alleged that the negligence of Dr. Williams was a proximate cause of serious and permanent injury to Mr. Nash. She sought damages and demanded a jury trial. An amended complaint was filed on May 23, 2013, adding claims that Dr. Williams placed an NG tube in a patient who was not mentally competent during the procedure and that Dr. Williams failed to obtain consent from Millsap to place the NG tube.

A jury trial was held July 8 though July 11, 2013. Yuris Gaunt, a nurse who helped care for Mr. Nash after his surgery, testified that on November 6, 2009, she talked with

SLIP OPINION

Mr. Nash about placing an NG tube because Dr. Williams had ordered one on November 4, 2009. She documented in Mr. Nash's chart that he refused the NG tube. Gaunt recalled that Mr. Nash was confused that morning, and she had documented in Mr. Nash's medical chart that he was "agitated and confused" that morning. She further stated that she wrote in the medical chart that Nash was "[t]rying to climb out of bed; patient is hallucinating and states, 'I can see chickens.'" Gaunt stated that her notes in Mr. Nash's medical records indicated that Mr. Nash was subsequently given the drug Haldol at approximately 10:20 a.m., per Dr. Williams's order, which further instructed that the medicine could be given every six hours as needed. Gaunt testified that she assisted Dr. Williams during his placement of the NG tube that afternoon and that she did not recall there being any suggestion that the placement was due to any type of emergency situation. Gaunt further testified that she did not recall any discussion between Dr. Williams and Mr. Nash concerning the risks or benefits of placing the NG tube, and that even if there had been such a discussion, she did not believe that Mr. Nash would have understood it because of his confused mental state. According to Gaunt, while Dr. Williams was trying to place the NG tube, Mr. Nash was trying to fight it off, and that she and the doctor's assistant each had to hold Mr. Nash's hands down because he was resisting. She also stated that Dr. Williams appeared to have a hard time getting the tube inserted. According to Gaunt, Mr. Nash's medical records stated that he was given a second dose of Haldol at 1:30 p.m., which was the time that Dr. Williams was placing the NG tube. Gaunt also recalled that after Dr. Williams placed the tube he did not perform the routine check to ensure that it was placed correctly. Gaunt also stated that shortly after

Dr. Williams left the room, Mr. Nash started gasping for air, was having difficulty breathing, and his blood pressure dropped.

On cross-examination, Gaunt stated that it took Dr. Williams several tries to place the NG tube but once he placed it, Mr. Nash quit fighting. She also confirmed that she made two nursing notes at 1:30 p.m. and that while there was no mention in the first note, she stated in the second note that "Patient vomited minimal amount." But, Gaunt could not specifically recall Mr. Nash vomiting and whether it would have occurred before, during, or after the placement of the tube. She also stated that she would not have assisted with the placement of the NG tube if she had heard Mr. Nash state that he did not want the tube.

Kristi Brockette, who at the time of this incident was the charge nurse, testified that Gaunt approached her on the morning of November 6 and told her that she had an order to place an NG tube but that Mr. Nash was refusing it. Gaunt also told her that Mr. Nash appeared agitated and confused. Brockette stated that she went with Gaunt to talk to Mr. Nash to explain the procedure for placing an NG tube and that Mr. Nash was adamant that he did not want it because his brother had died from the placement of an NG tube. She also confirmed Gaunt's recollection that Mr. Nash was having periods of confusion that morning. Brockette instructed Gaunt to notify Dr. Williams that Mr. Nash had refused the NG tube. Brockette also stated that she did not observe any emergency situation that necessitated the placement of the NG tube.

Dr. Stephen Cohen, a colorectal surgeon, testified as an expert witness for Millsap. Dr. Cohen stated that he reviewed Baptist Health's policies regarding consent, as well as the

4

applicable Arkansas statutes, and interpreted them to require a doctor to seek consent before performing a procedure in the absence of an emergency situation. Dr. Cohen opined that after performing surgery on Mr. Nash, Dr. Williams deviated from the standard of care when he improperly positioned an NG tube "that probably wasn't needed." He also stated that the standard of care is to have someone else in a patient's room to verify that the patient wants the tube or to have the next of kin or power of attorney grant consent but that verbal consent would be sufficient. Dr. Cohen stated that, based on his review of the medical records and other evidence, Mr. Nash was not capable of granting consent for placement of the NG tube, and he specifically pointed to the evidence of Mr. Nash's hallucinations and the fact that Mr. Nash received two doses of Haldol in a short period of time as the basis for his conclusion. Dr. Cohen also took issue with the fact that Mr. Nash's death certificate listed the cause of death as colon cancer. He admitted that he never treated Mr. Nash but opined, based on his review of the medical records, that Nash died as a result of "multisystem organ failure." He further opined that the effects caused by the incorrect placement of the NG tube undoubtedly were the primary cause of his death.

On cross-examination, Dr. Cohen admitted that he had no idea what conversation may have occurred between Dr. Williams and Mr. Nash regarding the placement of the NG tube, and he also admitted that sometimes a patient may refuse to allow a nurse to perform a procedure but will subsequently allow a doctor to do it.

Nancy Millsap, Ms. Nash's daughter, testified that she went to her father's pre-operative appointment with Dr. Williams. She stated that her father expressed concern about

5

needing a colostomy bag and specifically stated that he did not want an NG tube. Millsap explained that her father was fearful of an NG tube because his brother had died with an NG tube in place and that she and her father explained this to Dr. Williams and his nurse. Millsap stated that Dr. Williams told them there were other things that could be done and "that probably he wouldn't need one." Millsap further stated that her father was so fearful of an NG tube that he would not have had the surgery if he had to have a tube, and that he reiterated this to Dr. Williams at the hospital. Millsap stated that she was with her father on the morning of November 6, and that he was hallucinating and thought there were chickens in the hospital room. She also stated that there had been several attempts during the evening of November 5 and the morning of November 6 to place an NG tube, and that each time her father refused it. Millsap stated that when Dr. Williams came in after lunch she told him that the nurses had upset her father with their attempts to place an NG tube. Dr. Williams asked Millsap and the other family members to step out of the room so that he could check Mr. Nash's incision. She stated that at the time she left the room she had no idea Dr. Williams was going to place an NG tube. According to Millsap, when Dr. Williams came out of the room, he said the incision looked good and told the family to wait before going back in because the nurses were changing Mr. Nash's gown. She stated that there was no conversation about Dr. Williams just having placed an NG tube, and that when she finally was allowed back into the hospital room, her father was "gray" and she thought he was dead and screamed for help. She then noticed her father was "tied to the bed, and he had a tube in his

6

nose." Millsap explained that her father was quickly transferred to a critical care unit, and when she was finally allowed to see him, he had been intubated and was on a ventilator.

Jill Massiet, Vice President for Patient Care at Baptist Health Medical Center of Little Rock and Baptist Health Rehabilitation Institute, testified regarding a "Consent for Treatment" policy contained in the medical center's administrative patient care manual. She explained that the policy applies to all patients who receive care at Baptist Health and applies to all caregivers for any patient. She stated that this policy, which governed patient consent, tracked Arkansas statutory law with respect to patient consent. On cross-examination, Massiet stated that there was no policy requiring written consent for placement of an NG tube. She also stated that when a patient signs into the hospital for treatment, he or she signs a general consent form, giving the hospital general consent to do necessary procedures, but that specific invasive procedures would have to be discussed with the patient.

At the close of Millsap's case, Dr. Williams moved for a directed verdict "on all issues of negligence, proximate causation, and damages." The circuit court denied the motion, and Dr. Williams then testified on his own behalf. Dr. Williams stated that during his presurgical visit with Mr. Nash he discussed with him possible complications associated with the surgery. Dr. Williams did not recall any discussion with Mr. Nash or his daughter about an NG tube and testified that if there had been such a discussion he would have included it in his physician notes. Dr. Williams stated that he first ordered the NG tube on November 4, after receiving a call concerning Mr. Nash and some hiccups and abdominal distention. Then, on November 6, Dr. Williams stated that he examined Mr. Nash and noticed that his abdomen was very

distended and that he was uncomfortable and restless. According to Dr. Williams, he told Mr. Nash that he thought he needed to place an NG tube and gave him the reasons for placing it. Dr. Williams stated that Mr. Nash was able to understand him and to communicate with him and that Mr. Nash agreed to the placement of the tube. Dr. Williams did not recall Mr. Nash using his hands to try to push the tube away. He also stated that he did not discuss the placement with the family because Mr. Nash consented to it, and Dr. Williams believed there was some urgency to place the tube. Dr. Williams stated that he subsequently ordered Mr. Nash be moved to the intensive care unit so he could be more closely monitored.

On cross-examination, Dr. Williams stated that he explained the benefits and risks of placing the NG tube and that Mr. Nash did not appear to be confused and appeared capable to give consent. He admitted, however, that he was not aware of Mr. Nash's earlier hallucinations at the time he spoke with him about placing the NG tube. He again stated that Mr. Nash did not resist placement of the tube, and that while his nurse may have held Mr. Nash's hand, no one used force to restrain him during the placement. Dr. Williams admitted that he knew that Mr. Nash had been refusing placement of the NG tube since he ordered it on November 4. He also stated that in response to a previous request for admission proffered by Millsap that he admitted he or his nurse restrained Mr. Nash in order to place the NG tube. When asked if Mr. Nash's condition presented an emergency situation requiring immediate placement of the NG tube, Dr. Williams stated that he believed "it should have been done right then." Dr. Williams stated that he did not note in Mr. Nash's

chart that the patient had given consent for placement of the NG tube but that it is not always necessary to document verbal consent. But, when presented with the rules and regulations applicable to medical staff, Dr. Williams admitted that Baptist Health has a policy that a doctor who explains a procedure to a patient must provide documentation of having done so. Dr. Williams also admitted that Baptist has a policy that requires all patients undergoing medical treatments to give consent except in emergency situations. He further admitted that the applicable hospital policy allows for emergency/implied consent only when there is no one immediately available who is authorized to give consent for the patient. Thereafter, Dr. Williams admitted that he could have talked to Millsap before placing the tube but did not do so.

Dr. Roderick Boyd, a general surgeon, testified as an expert witness on behalf of Dr. Williams. Dr. Boyd testified that he believed Dr. Williams complied with the standard of care in treating Mr. Nash and that nothing he did caused him injury or resulted in Mr. Nash's death. He also opined that, for purposes of consent, it was sufficient for Dr. Williams to explain the tube placement to Mr. Nash and for Mr. Nash to nod in agreement. Dr. Boyd further opined that the tube needed to be placed "sooner than later." On cross-examination, Dr. Boyd admitted that during a prior deposition he stated that Mr. Nash was not of sound mind at the time Dr. Williams placed the NG tube, but at trial he deferred to Dr. Williams's judgment.

Following this testimony, the defense rested, and Dr. Williams renewed his previous motion for directed verdict and further argued that, based on the testimony of Dr. Williams,

9

Mr. Nash consented to the NG tube, and without any evidence to the contrary, there was no issue to submit to the jury. The circuit court denied the motion, and the parties began discussing the issue of jury instructions.

In the course of considering jury instructions, Millsap objected to the circuit court giving AMI Civ. 1508, on the basis that the case to be submitted the jury was not an informed-consent case, and that instruction was designed for informed consent and incorporated Arkansas statutes on informed consent. Millsap stated that she had no claim based on "adequacy of information to Mr. Nash." According to Millsap, her case was based on a claim that Mr. Nash refused consent and what information he was or was not supplied with was immaterial. Millsap then proffered a modified version of AMI Civ. 1508, which incorporated parts of Arkansas statutes regarding consent to treatment. Dr. Williams argued that the model instruction was appropriate if the court was going to submit the case to the jury on the allegation of lack of consent, because it was his position that Mr. Nash gave consent and the model instruction was therefore applicable, and that modified instructions should be avoided where there is a model instruction that applies. Millsap next objected to the giving of AMI Civ. 1509 for the same reasons—it was an informed-consent instruction and not applicable, as there was no proof of any lack of informed consent. Dr. Williams argued that the instruction was appropriate because the note on use said it should be given where there is an issue of granting or withholding consent. Thereafter, the court rejected Millsap's proffered instruction that was a modified version of AMI Civ. 1508, and gave both

AMI Civ. 1508 and 1509. The jury returned a verdict in favor of Dr. Williams, and this appeal followed.

Millsap argues as her first point on appeal that the circuit court abused its discretion in giving the jury erroneous and misleading instructions in a case premised on lack of consent. According to Millsap, the circuit court abused its discretion when it instructed the jury on the issue of informed consent, as such instructions were misleading because the issue of informed consent was irrelevant to her cause of action based on a lack of actual consent. Further, Millsap argues that the circuit court abused its discretion by not properly instructing the jury with respect to the issue of consent where there was a basis in the evidence for such instruction.

Dr. Williams counters that the circuit court did not abuse its discretion in instructing the jury as the instructions given conformed to the facts and law and were not misleading. In support, Dr. Williams contends that the issue presented to the jury was not whether Mr. Nash had withheld consent in the past but, rather, the issue was whether, due to a serious change of circumstances, Dr. Williams informed the patient of his change in condition such that the patient trusted his doctor and consented to the insertion of the NG tube. Dr. Williams further argues that "informed consent" was most certainly an issue at trial as indicated by Dr. Williams's uncontradicted testimony that Mr. Nash gave consent and that such consent was naturally informed consent.

It is well settled that a party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the

11

SLIP OPINION

instruction. *Barnes v. Everett*, 351 Ark. 479, 95 S.W.3d 740 (2003). When instructions are requested that do not conform to the Arkansas Model Jury Instructions (AMI), they should be given only when the circuit court finds that the AMI instructions do not contain an essential instruction or do not accurately state the law applicable to the case. *Id.* This court will not reverse a circuit court's refusal to give a proffered instruction unless there was an abuse of discretion. *Id.*

Here, the disputed jury-instruction issue centers on the giving of model instructions on a theory of informed consent and the rejection of a proffered instruction based on Arkansas statutes governing consent to treatment. On the one hand, the circuit court approved Millsap's modified version of AMI Civ. 1507 and instructed the jury as follows:

> Nancy Millsap, as Special Administratrix of the Estate of Robert Nash, asserts two separate grounds for recovery: First, that there was negligence on the part of Victor Williams, M.D.; and, second, that Victor Williams, M.D. failed to obtain proper consent before he placed a nasogastric tube.
> With respect to the claim of negligence, Nancy Millsap, as Special Administratrix of the Estate of Robert Nash, has the burden of proving each of three essential propositions: First, that the Plaintiff has sustained damages; second, Victor Williams, M.D. was negligent; and, third, that such negligence was a proximate cause of damages to the Plaintiff.
> With respect to the failure to obtain consent, Nancy Millsap, as Special Administratrix of the Estate of Robert Nash, has the burden of proving each of three essential propositions: First, that the Plaintiff sustained damages; second, that the nasogastric tube was placed without consent; third, that such failure was a proximate cause of damages to the Plaintiff.
> It will be necessary for you to consider separately each asserted ground for recovery. If you find from the evidence that every essential proposition with respect to any one ground for recovery has been proved, then your verdict should be for the Plaintiff and against the party or parties against whom that ground for recovery is asserted; but if you find from the evidence that any essential proposition with respect to any one ground for recovery has not been proved, then your verdict with respect to that ground for recovery should be for the Defendant.

12

But, then the circuit court refused Millsap's other proffered instruction, based on statutory language found in Arkansas Code Annotated sections 20-9-601 to –603 (Repl. 2014). The proffered instruction stated as follows:

> Arkansas law provides a doctor is required to obtain consent before treating or performing medical procedures on a patient. Consent may be written or oral and any adult may consent for himself or herself. If an adult is of unsound mind, then any adult child of the patient may provide consent.
> "Unsound mind" means the inability to perceive all relevant facts related to one's condition and proposed treatment so as to make an intelligent decision based thereon, regardless of whether the inability is only temporary, has existed for an extended period of time, or occurs or has occurred only intermittently. The inability may be due to natural state, age, shock, or anxiety, illness, injury, drugs or sedation or other cause of whatever nature. An individual shall not be considered to be of unsound mind based solely upon his or her refusal of medical care or treatment.
> Consent is not required when an emergency exists AND there is no one immediately available who can provide consent for the patient. An emergency is defined as a situation in which, in competent medical judgment, the proposed procedure is immediately or imminently necessary and any delay occasioned by an attempt to obtain a consent would reasonably be expected to jeopardize the life, health or safety of the person affected.

Thus, despite the notice to the jury that Millsap was alleging a claim for failure to obtain consent, there were no further instructions given that explained when a doctor must obtain consent, how consent may be given, or who may give consent. It is obvious from the focus of the evidence presented in this trial, as demonstrated by the testimony recited herein, that Millsap's claim was that Mr. Nash either did not consent to the placement of the NG tube or was unable to give consent because of mental impairment. The only testimony at all about informed consent was the self-serving testimony of Dr. Williams that he explained the need for the NG tube and that Mr. Nash then consented to its placement. This testimony was simply presented to refute Millsap's claim that Mr. Nash never gave consent.

13

It is true that nonmodel jury instructions should be given only when the circuit court finds that the model instructions do not contain an essential instruction or do not accurately state the law applicable to the case. *Nelson v. Stubblefield*, 2009 Ark. 256, 308 S.W.3d 586; *Barnes*, 351 Ark. 479, 95 S.W.3d 740. But, that was precisely the situation that occurred in this case. There was no model jury instruction regarding consent to treatment, and the instructions related to informed consent were not applicable to the case before the jury. While the model instructions are to be used as a rule, a nonmodel instruction may be used when an AMI instruction cannot be modified. *Barnes*, 351 Ark. 479, 95 S.W.3d 740. Because there was no applicable model instruction, Millsap proffered an instruction based on the consent-to-treatment statutes, but the circuit court rejected it. This court has held that it is error for the circuit court to fail to instruct the jury on a statute applicable to the case. *Allstate Ins. Co. v. Dodson*, 2011 Ark. 19, 376 S.W.3d 414.

Compounding the circuit court's refusal to give Millsap's proffered instruction was its giving of AMI Civ. 1508, which explained the duty of a surgeon to supply adequate information so that a patient can make a reasoned decision to give or withhold consent, and AMI Civ. 1509, which instructed the jury on the elements that it could consider in determining "whether the failure to obtain an informed consent was a proximate cause of any damages sustained." These two instructions regarding informed consent had absolutely nothing to do with the allegation that Dr. Williams placed the NG tube without *any* consent by Mr. Nash. Informed consent presupposes that a patient consented to the procedure but may have done so without all information necessary to make a reasoned decision.

SLIP OPINION

It is axiomatic that when a jury instruction is erroneous or misleading, it is prejudicial and should not be given to the jury. *See Bedell v. Williams*, 2012 Ark. 75, 386 S.W.3d 493; *Allstate*, 2011 Ark. 19, 376 S.W.3d 414. Although the circuit court presented the jury with a modified version of AMI Civ. 1507, its subsequent giving of AMI Civ. 1508 and 1509 only served to confuse the jury as to what Millsap's cause of action was and what she was required to present to prove her case. It must be remembered that the purpose of jury instructions is to inform the jury of the legal principles applicable to the facts presented, and to furnish a guide to assist jurors in reaching a verdict. *Hearn v. E. Tex. Motor Freight Lines*, 219 Ark. 297, 241 S.W.2d 259 (1951). In sum, the circuit court's failure to properly instruct the jury in this case calls into question the validity of the jury's verdict, as it was based on incomplete and confusing instructions. This clearly constituted an abuse of discretion, and we therefore must reverse and remand. Finally, because we are reversing and remanding for a new trial, it is not necessary to address Millsap's second point on appeal regarding the sufficiency of the evidence.

Reversed and remanded.

BAKER, GOODSON, and HOOFMAN, JJ., dissent.

**CLIFF HOOFMAN, Justice, dissenting.** Because I believe that the majority errs in reversing and remanding this case and overlooks this court's prior case law, I respectfully dissent. While the majority opinion states that it is unnecessary to address appellant's second point on appeal, the two points are so interrelated that I think they must be addressed together, and I do so in this dissent. Appellant first contends that the trial court abused its discretion by providing erroneous and misleading instructions to the jury concerning

15

"informed consent" rather than her proffered instruction. Specifically, she argues that the trial court provided the jury with AMI Civ. 1508 (2013) and AMI Civ. 1509 (2013) over her objection, which concern whether a patient has been provided with sufficient information in order to provide consent. She alleges that these instructions were misleading because she argues that her case did not involve whether Dr. Williams provided adequate information but whether Dr. Williams received actual consent. In support, she cites to Arkansas Code Annotated §§ 20-9-601 to -603 for a recitation of Arkansas's law regarding consent in general and alleges that "consent" and "informed consent" are two entirely separate issues.

Additionally, she explains that the trial court's instructions did not provide the jury with guidance as to the important elements that are required for consent, "including whether Mr. Nash was even capable of providing consent, and if he was in fact 'of unsound mind[,]' whether there was implied consent requiring both the existence of an emergency AND evidence that no other authorized person was 'immediately available' who could provide consent." Finally, appellant contends, in what she identifies as her second point on appeal, that "The Evidence Was Sufficient For A Jury To Find That Robert Nash Suffered Injury As A Result Of Undergoing A Nasogastric Procedure Performed Without Proper Consent." Specifically, she outlines the evidence presented at trial that could have formed a basis in the evidence for the trial court to use in giving her proffered instruction, had the court not refused to do so. Appellee disagrees and contends that the trial court did not abuse its discretion. I would affirm.

A party is entitled to a jury instruction when it is a correct statement of the law and there is some basis in the evidence to support giving the instruction. *Boellner v. Clinical Study Ctrs., LLC*, 2011 Ark. 83, 378 S.W.3d 745. However, this court will not reverse a trial court's refusal to give a proffered instruction unless there was an abuse of discretion. *Edwards v. Stills*, 335 Ark. 470, 984 S.W.2d 366 (1998). Furthermore, it is not error for the trial court to refuse a proffered jury instruction when the stated matter is correctly covered by other instructions. *Id*. When instructions are requested that do not conform to the Arkansas Model Jury Instructions ("AMI"), they should be given only when the trial court finds that the AMI instructions do not contain an essential instruction or do not accurately state the law applicable to the case, due to our longstanding preference in favor of AMI instructions over non–AMI instructions. *Nelson v. Stubblefield*, 2009 Ark. 256, 308 S.W.3d 586; *Boellner, supra*.

Additionally this court has said that AMI instructions are to be used as a rule, and non–AMI instructions should be used only when an AMI instruction does not exist or cannot be modified. *Allstate Ins. Co. v. Dodson*, 2011 Ark. 19, 376 S.W.3d 414. It is error for the trial court to fail to instruct the jury on a statute applicable to the case; however, it is also error for the trial court to instruct the jury on an inapplicable statute. *Id*. Portions of a statute not applicable to the facts of the case must be deleted. *Id*.

Specific objections to instructions are necessary to preserve an issue for appeal. Ark. R. Civ. P. 51. Specifically, Arkansas Rule of Civil Procedure Rule 51 states,

> At the close of the evidence or at such earlier time as the court may reasonably direct, any party may submit requested jury instructions to the court. The court shall inform counsel of its proposed action upon the requested instructions and also inform

counsel of all other instructions it proposes to submit to the jury. The court shall instruct the jury prior to the arguments of counsel. *No party may assign as error the giving or the failure to give an instruction unless he objects thereto before or at the time the instruction is given, stating distinctly the matter to which he objects and the grounds of his objection*, and no party may assign as error the failure to instruct on any issue unless such party has submitted a proposed instruction on that issue. Opportunity shall be given to make objections to instructions out of the hearing of the jury.

A mere general objection shall not be sufficient to obtain appellate review of the court's action relating to instructions to the jury except as to an instruction directing a verdict or the court's action in declining to do so.

(Emphasis added.) Therefore, this court has interpreted this rule to require specific objections in order to alert the trial court as to why the instruction is wrong. *Allstate Ins. Co.*, *supra*. Additionally, this court has held that a general objection to a jury instruction is permissible only if the instruction is inherently erroneous, meaning the instruction could not be correct under any circumstance, and is binding in nature. *Id*.

At trial, appellant offered the following objections to two of the jury instructions at issue in this appeal and proffered a modified jury instruction.

Your Honor, the Plaintiff objects to the giving of AMI 1508. The position of the Plaintiff is this is not an informed consent case. 1508 is an instruction designed for informed consent cases and incorporates the Arkansas statutes on informed consent. We're not claiming in this case adequacy of information to Mr. Nash. *We're claiming that he refused* -- that that was immaterial as to what information he was or was not supplied with, and we're not going to claim that any information was or was not adequate. I don't even know that. So we would object to the giving of AMI 1508.
. . . .
And I have a -- In regard to that your Honor, I would proffer the Plaintiff's version of AMI 1508, which is modified to incorporate parts of Arkansas Code Ann. 20-9-601 and the following.
. . . .
The Plaintiffs next object to AMI 1509. It's -- for the same reasons. This is an informed consent instruction. And, honestly, there's no proof of lack of any informed consent and we're not claiming that. And this is part of the informed consent statute

which, in the Plaintiff's belief, is inapplicable, and that there are no AMI instructions that particularly apply to consent. And that's why we have relied on the statute in drafting instructions that are substantially modified.

(Emphasis added.)

In pertinent part, the trial court read the following jury instructions to the jury, encompassing AMI Civ. 1501, 1508, and 1509 (2013):

### [*AMI 1501 as modified* [1]]

In treating and/or obtaining the consent of a patient, a physician must possess and apply with reasonable care the degree of skill and learning ordinarily possessed and used by members of his profession in good standing, engaged in the same type of practice in the locality in which he practices, or in a similar locality. A failure to meet this standard is negligence.

In determining the degree of skill and learning the law required of Victor Williams, M.D., and in deciding whether he used the degree of skill and learning which the law required, you may consider only the expert testimony of the physicians.

In deciding whether any negligence of Victor Williams, M.D. was a proximate cause of injuries and/or death of Robert Nash, that otherwise would not have occurred, you may consider only the expert testimony of the physicians.

In considering the evidence on any other issue in this case, you are not required to set aside your common knowledge, but you have a right to consider all the evidence in light of your own observations and experiences in the affairs of life.

The fact that a death occurred is not, of itself, evidence of negligence on the part of anyone.

### [*AMI 1507 as modified* [2]]

Nancy Millsap, as Special Administratrix of the Estate of Robert Nash, asserts two separate grounds for recovery: First, that there was negligence on the part of Victor Williams, M.D.; and, second, that Victor Williams, M.D. failed to obtain proper consent before he placed a nasogastric tube.

---

[1]The court accepted appellant's modified version of AMI 1501 over appellee's objection, striking the word "informed" before "consent."

[2]The court accepted appellant's modified version of AMI 1507 over appellee's objection, striking the word "informed" before "consent."

With respect to the claim of negligence, Nancy Millsap, as Special Administratrix of the Estate of Robert Nash, has the burden of proving each of three essential propositions: First, that the Plaintiff has sustained damages; second, Victor Williams, M.D. was negligent; and, third, that such negligence was a proximate cause of damages to the Plaintiff.

With respect to the failure to obtain consent, Nancy Millsap, as Special Administratrix of the Estate of Robert Nash, has the burden of proving each of three essential propositions: First, that the Plaintiff sustained damages; second, that the nasogastric tube was placed without consent; third, that such failure was a proximate cause of damages to the Plaintiff.

It will be necessary for you to consider separately each asserted ground for recovery. If you find from the evidence that every essential proposition with respect to any one ground for recovery has been proved, then your verdict should be for the Plaintiff and against the party or parties against whom that ground for recovery is asserted; but if you find from the evidence that any essential proposition with respect to any one ground for recovery has not been proved, then your verdict with respect to that ground for recovery should be for the Defendant.

[*AMI 1508*]

In obtaining consent to perform a procedure, a surgeon is under a duty to supply adequate information to enable the patient to make a reasoned and intelligent decision to give or withhold consent.

Other than in an emergency situation, the information required is that type as would customarily have been given at the time of treatment to a patient in a similar situation by other surgeons with similar training and experience practicing in the locality in which he practices or in a similar locality.

[*AMI 1509*]

In determining whether the failure to obtained an informed consent was a proximate cause of any damages sustained by Nancy Millsap, as Special Administratrix of the Estate of Robert Nash, you may consider the following factors: (a) Whether Robert Nash knew, or whether a person of ordinary intelligence and of awareness in a position similar to that of Robert Nash could reasonably be expected to know, of the risks or hazards inherent in such a procedure; (b)Whether Robert Nash would have undergone the procedure, regardless of the risks involved, or whether he did not wish to be informed thereof; (c) Whether it was reasonable for Doctor Williams to limit disclosure of information because that disclosure could be expected to adversely and substantially affect Robert Nash's condition.

In place of the trial court reading AMI Civ. 1508, appellant proffered the following modified jury instruction that she alleges incorporates Arkansas Code Annotated §§ 20-9-601 to -603:

> Arkansas law provides a doctor is required to obtain consent before treating or performing medical procedures on a patient. Consent may be written or oral and any adult may consent for himself or herself. If an adult is of unsound mind, then any adult child of the patient may provide consent.
>
> "Unsound mind" means the inability to perceive all relevant facts related to one's condition and proposed treatment so as to make an intelligent decision based thereon, regardless of whether the inability is only temporary, has existed for an extended period of time, or occurs or has occurred only intermittently. The inability may be due to natural state, age, shock or anxiety, illness, injury, drugs or sedation or other cause of whatever nature. An individual shall not be considered to be of unsound mind based solely upon his or her refusal of medical care or treatment.
>
> Consent is not required when an emergency exists AND there is no one immediately available who can provide consent for the patient. An emergency is defined as a situation in which, in competent medical judgment, the proposed procedure is immediately or imminently necessary and any delay occasioned by an attempt to obtain a consent would reasonably be expected to jeopardize the life, health or safety of the person affected.

At trial, appellant objected to the inclusion of AMI Civ. 1508 and 1509 instead of her proffered jury instruction, explaining that she was not arguing whether the information supplied was adequate but that "[Nash] refused."  The jury had already been instructed that the failure to obtain proper consent was a ground for recovery in the modified AMI Civ. 1507 jury instruction proposed by appellant.  Therefore, it was not error for the trial court to refuse the proffered jury instruction when the jury had been instructed in other instructions that the failure to obtain consent was a ground for recovery.  *See Edwards v. Stills*, 335 Ark. 470, 984 S.W.2d 366 (1998).

SLIP OPINION

Additionally, the trial court did not abuse its discretion, as the majority opines, for including AMI Civ. 1508 and 1509 in its instructions. The first paragraph in the notes on use of AMI Civ. 1508 provides that "[t]his instruction should be given when a question is submitted as to whether adequate information was supplied by the medical care provider *in connection with the granting or withholding of consent to treatment*." (Emphasis added.) Similarly, the first sentence in the notes on use of AMI Civ. 1509 provides that "[t]his instruction should be given in addition to AMI 1501 when a question is submitted as to whether adequate information was supplied by the medical care provider *in connection with the granting or withholding of consent to treatment*." (Emphasis added.) AMI Civ. 1508 explained to the jury that not only was Dr. Williams required to obtain consent but also that he was obligated to supply adequate information for Nash to decide whether to give or withhold consent.

Furthermore, the evidence presented in Dr. Williams's testimony supported such an instruction when Dr. Williams testified that he met with Nash and explained the reasons why he thought that he needed an NG tube. At trial, Dr. Williams testified that on November 6, 2009, he placed an NG tube after Nash consented to the procedure by "nodding his head" after he explained why he thought the procedure was necessary. He explained that Nash was cooperative during the NG placement, that Nash appeared to be of sound mind, and that he did not speak with any family members because Nash had consented to the procedure. Therefore, there was some basis in the evidence to support giving the instruction. *See Boellner*, *supra*. While the majority states that this testimony was "self-serving," this court has repeatedly held that a party is entitled to a jury instruction when it is a correct statement of

the law and there is some basis in the evidence to support giving the instruction. *Id.* The fact that the evidence was presented through the testimony of Dr. Williams is immaterial. Thus, the inclusion of this instruction and the additional instruction of AMI Civ. 1509 was not misleading but instead may have been beneficial to appellant, and I find that appellant failed to demonstrate that she was prejudiced or that the trial court abused its discretion in giving the two jury instructions. *See generally Edwards, supra.*

Appellant also argues on appeal that her proffered jury instruction was necessary to provide the jury with guidance on the important elements that are required for consent, "including whether Mr. Nash was even capable of providing consent, and if he was in fact 'of unsound mind[,]' whether there was implied consent requiring both the existence of an emergency AND evidence that no other authorized person was 'immediately available' who could provide consent." She further identified on appeal testimonial evidence that supported the inclusion of her proffered instruction. However, contrary to the majority opinion, appellee correctly contends that appellant failed to state this particular argument as a basis for her objection at trial.

At trial, appellant specifically stated the following when objecting to AMI Civ. 1508 and offering the proffered instruction:

> "*We're claiming that he refused* –– that that was immaterial as to what information he was or was not supplied with, and we're not going to claim that any information was or was not adequate. I don't even know that. So we would object to the giving of AMI 1508.
> . . . .

And I have a -- In regard to that your Honor, I would proffer the Plaintiff's version of AMI 1508, which is modified to incorporate parts of Arkansas Code Ann. 20-9-601 and the following.

(Emphasis added.) While the majority holds that "it is obvious from the focus of the evidence presented in this trial . . . that Millsap's claim was that Mr. Nash either did not consent to the placement of the NG tube or was unable to give consent because of mental impairment," the appellant cannot change the specific arguments made before the trial court now on appeal, even if the new argument may be meritorious. In fact, it is well settled that this court will not consider arguments raised for the first time on appeal. *Brown v. Lee*, 2012 Ark. 417, 424 S.W.3d 817. Moreover, a party cannot change the grounds for an objection or motion on appeal but is bound by the scope and nature of the arguments made at trial. *Id.* Appellant was required to make a specific objection to alert the trial court as to why she thought the instruction was wrong and was required to be equally specific as to why her proffered modified, instruction should have been given. She may not on appeal change the scope of this argument. *Allstate Ins. Co.*, *supra*; *Bell v. Misenheimer*, 2009 Ark. 222, 308 S.W.3d 120. Accordingly, I think we are precluded from addressing the merits of this new argument on appeal, and I would affirm the trial court.

BAKER and GOODSON, JJ., join.

*Brad Hendricks Law Firm*, by: *Lamar Porter* and *Todd Jones*, for appellant.

*Womack, Phelps & McNeill*, by: *Paul McNeill* and *Chuck Gschwend*, for appellee.

*Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, for amicus curiae Arkansas Trial Lawyers Association.